```
 1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION

 3
                   CASE NO.:  22-cv-21332-MARTINEZ/BECERRA
 4
    J.F.,
 5
                   Plaintiff,
 6   VS.

 7   CARNIVAL CORPORATION, a Panamanian
     Corporation d/b/a CARNIVAL CRUISE LINES,
 8
                   Defendant.
 9   _____/

10
              VIDEO DEPOSITION BY REMOTE ZOOM OF
11                    DOMINICK FROIO, JR.

12
            Taken on Behalf of the Plaintiff
13

14
        DATE TAKEN:           February 28, 2023
15      TIME:                 10:07 AM - 1:10 PM
        PLACE:                ALL Participants
16                            Remotely by Zoom

17

18
              Deborah L. Waters, CLP, FPR
19          Stenographic Court Reporter
              Certified Legal Professional
20      Certified Florida Professional Reporter
              Board Certified Civil Trial Law SS
21    and Notary Public, State of Florida at Large.

22

23

24

25
```

Page 2

```
1              APPEARANCES
2
3   APPEARANCE ON BEHALF OF THE PLAINTIFF
4
5       NICHOLAS I. GERSON, ESQUIRE
        GERSON & SCHWARTZ, P.A.
6          1980 Coral Way
           Miami, Florida 33145
7
           305.371.6000
8          ngerson@gslawusa.com
9
10
11
12
13  APPEARANCE ON BEHALF OF THE DEFENDANT
14
15      LAUREN N. CABEZA, ESQUIRE
        WILLIAM SEITZ, ESQUIRE
16      CHARLOTTE A. ROBINSON, ESQUIRE
        MASE MEBANE SEITZ, P.A.
17      2001 South Biscayne Drive
           Suite 800
18         Miami, Florida 33131
19         305.377.3770
20         lcabeza@maselaw.com
           wseitz@maselaw.com
21
22
23          ALSO PRESENT
24      Michael Stingo, Videographer
25
```

Page 3

```
1           INDEX OF PROCEEDINGS
      ZOOM VIDEO DEPOSITION OF DOMINICK FROIO, JR.
2
3                              PAGE NO.
4   Direct Examination by Mr. Gerson        7
    Cross Examination by Ms. Cabeza       128
5
    Certificate of Oath                   138
6   Certificate of Reporter               139
    Errata Page                        140/141
7
8
9
10
11
12          INDEX OF EXHIBITS
13        PLAINTIFF'S EXHIBITS
14  NO.      DESCRIPTION        PAGE NO.
15
16   1  Horizon Deck Plan              137
17
18  (***NOTE:  Exhibit 1 retained by Attorney Gerson
        and not forwarded to the court reporter.)
19
20          DEFENDANT'S EXHIBITS
21  NO.      DESCRIPTION        PAGE NO.
22
23          ***** NONE *****
24
25
```

Page 4

```
1   ALL Participants        February 28, 2023
    by Remote Zoom
2
3          (Whereupon, the following
4   proceedings were had:)
5          THE VIDEOGRAPHER:  We are on the
6   record for the video deposition of
7   Dominick Froio, Jr. taken in the matter of
8   J.F. versus Carnival Corporation, doing
9   business as Carnival Cruise Lines.
10         Today is February 28th, 2023.
11  And the time is 10:08 a.m.
12         This deposition is being
13  conducted by Zoom.  The court reporter is
14  Deborah Waters and the videographer is
15  Michael Stingo.
16         Will Counsel please introduce
17  themselves after which the court reporter
18  will swear in the witness.
19         MR. GERSON:  Nicholas Gerson on
20  behalf of the Plaintiff, J.F.
21         MS. CABEZA:  Lauren Cabeza and
22  Charlotte Robinson on behalf of the
23  Defendant.
24         THE COURT REPORTER:  Would the
25  witness please raise your right hand.
```

Page 5

```
1          Do you solemnly swear or affirm
2   that the testimony that you are about to
3   give in this matter will be the truth, the
4   whole truth, and nothing but the truth so
5   help you God.
6   WHEREUPON:
7               DOMINICK FROIO, JR.,
8   a witness herein, acknowledged having been duly
9   sworn and testified upon his oath as follows:
10         THE WITNESS:  Yes, ma'am.
11         THE COURT REPORTER:  Thank you,
12  sir.
13         DIRECT EXAMINATION
14  BY MR. GERSON:
15     Q   Okay.  Good morning.
16     A   Good morning.
17     Q   I don't think we have ever met before.  My
18  name is Nick Gerson and I will be taking your
19  deposition today, Mr. Froio.
20         Have you had your deposition taken before?
21     A   Yes, I have.
22     Q   How many times have you had your
23  deposition taken?
24     A   Dozens of times in my life.
25     Q   Are you employed?
```

Page 6

```
1     A    I am retired but I have a consulting
2  business.  I am retired.
3     Q    Where -- who did you retire from?
4     A    First from the New York State Police and
5  then from Carnival Cruise Line.
6     Q    Okay.  And how long were you employed with
7  Carnival Cruise Line?
8     A    Twenty-seven years.
9     Q    And what was your position working at
10 Carnival Cruise Line?
11    A    Over the years I started as investigator,
12 supervisor, manager, director, senior director, and
13 vice president.
14    Q    And when you retired, you retired as
15 the -- was Vice President or Senior Vice President
16 of Security?
17    A    Vice President of Security.
18    Q    Vice President of Security.
19         (Mr. Seitz joined the Zoom deposition.)
20 BY MR. GERSON:
21    Q    And where are you testifying from today,
22 sir?
23    A    From a friend of mine's office up in
24 Sunrise, Florida.
25    Q    Okay.  Do you mind telling me who that
```

Page 7

```
1  friend is?
2     A    Pardon me?
3     Q    Do you mind telling me who that friend is?
4     A    Sherif Assal.
5     Q    Is he an employee of Carnival?
6     A    No.
7     Q    Has he ever been an employee of Carnival?
8         THE VIDEOGRAPHER:  Counsel, your
9     audio is coming through not that great.
10 BY MR. GERSON:
11    Q    Has he ever been an employee of Carnival?
12    A    Sherif Assal used to be a vendor of mine.
13    Q    Okay.  And when you say a vendor of yours,
14 do you mean a vendor of Carnival's?
15    A    Yes.
16    Q    And what type of vendor?
17    A    Shoreside security.
18    Q    When you say a vendor of shoreside
19 security, are you saying that Sherif Assal operated
20 a private company that provided shoreside security?
21    A    Yes, sir.
22    Q    Is he in the room with you today?
23    A    No, sir.
24    Q    Okay.  Mr. Froio, what is your home
25 address?
```

Page 8

```
1     A    2816 Oakbrook Manor, Weston, Florida
2  33332.
3     Q    Okay.  And prior to appearing for today's
4  deposition, did you have an opportunity to speak
5  with anyone from Carnival, including Carnival's
6  lawyers, about your deposition today?
7     A    The Carnival attorneys.
8     Q    What Carnival attorneys did you speak to?
9     A    Lauren and Charlotte.
10    Q    Anyone else?
11    A    No, sir.
12    Q    Did you speak to anyone about your
13 deposition from corporate?
14    A    No, sir.
15    Q    When I say corporate, do you know what I
16 am referring to?
17    A    Carnival Corporation, correct.
18    Q    Yes, I just want to make sure.
19    A    Yes, sir.
20    Q    Okay.  Did you do anything to prepare for
21 today's deposition?
22    A    Just a short conversation with Lauren and
23 Charlotte.
24    Q    And what was discussed?  What did they ask
25 you?
```

Page 9

```
1     A    If I was familiar with this case that I am
2  not familiar with.  I am kind of familiar, but
3  recollection is not there at all.
4     Q    I mean --
5     A    Actually, I reached out to them because
6  your server served me a subpoena -- not me, to my
7  wife in the evening of Valentine's Day.  And it was
8  an attachment regarding a Dodge Ram Charger and a
9  warranty.  And I had no idea what the heck they are
10 talking about.
11    Q    I don't either.
12    A    That's attached.  So I don't know who has
13 our case attached to their subpoena.  That's why I
14 reached out to Curtis Mase's office.
15    Q    Okay.  And who did you reach out to from
16 Curtis Mase's office?
17    A    I was connected to Lauren and Charlotte.
18    Q    Okay.  Did they -- you said you were
19 vaguely familiar with the case.  Tell me what your
20 familiarity was or is?
21    A    That I signed off on a report.
22    Q    What type of report?
23    A    An investigative report.
24    Q    Concerning what?
25    A    Sexual assault allegation.
```

1    Q    And you have an independent recollection
2  about signing off about a sexual assault allegation?
3    A    To be honest with you, I don't.
4    Q    Can you tell me what the name of that
5  report is?
6    A    It's an investigative report.
7    Q    Okay.
8    A    And I am assuming -- not assuming, it must
9  have been a sexual assault allegation.
10    Q    Okay.  You mentioned -- other than signing
11  off on the sexual assault allegation report, tell me
12  what else you recall about this particular case
13  involving J.F.?
14    A    That it occurred in 2019 on a cruise ship.
15    Q    And what was being alleged?
16    A    Sexual assault.
17    Q    Was it also your understanding at the time
18  that it included not just a sexual assault but
19  forceable penetration, such as rape?
20    A    I don't recall.
21         MS. CABEZA:  Objection form.
22  BY MR. GERSON:
23    Q    As -- tell me what else you -- when do you
24  recall signing off on that report?
25    A    I don't.  It had to have been 2019.

1    Q    I understand.
2         You worked for Carnival for a significant
3  period of time, correct?
4    A    Yes, sir.
5    Q    Twenty-seven years I think I counted or
6  what you told me?
7    A    True.
8    Q    Okay.  And how long did you serve as the
9  Vice President of Security for Carnival?
10    A    Ten years.
11    Q    And when did you retire?
12    A    June of 2020.
13    Q    And the position as a Vice President of
14  Security Services at Carnival Cruise Line, who did
15  you report to?
16    A    Over the years or lastly?
17    Q    Well, let's talk lastly.
18    A    My direct report lastly was Lars Ljoen,
19  L-J-O-E-N.
20    Q    L-J-O-E-N?
21    A    Yes, sir.
22    Q    And what was his title?  Senior vice
23  president?
24    A    I think he was and EVP then.
25    Q    EVP?

1    A    Executive vice president, yes.
2    Q    And who would Lars report to; do you know?
3    A    The President, Christine Duffy.
4    Q    So from a security standpoint, as far as
5  Carnival Corporation is concerned, you were
6  essentially one direct report away from Christine
7  Duffy, correct?
8    A    Yes, sir.
9         MS. CABEZA:  Objection form.
10  BY MR. GERSON:
11    Q    And Christine Duffy would be the C.E.O. of
12  Carnival; would that be correct?
13    A    No, sir.
14    Q    Excuse me.  That would be Micky Arison.
15         What was Christine Duffy's position?
16    A    President of Carnival Cruise Line.
17    Q    President of Carnival Cruise Line?
18    A    Yes, sir.
19    Q    And then I imagine Ms. Duffy would report
20  then to Mr. Arison, correct?
21         MS. CABEZA:  Objection form.
22    A    Not directly to Micky, no.
23  BY MR. GERSON:
24    Q    Okay.  Tell me what were your duties and
25  responsibilities as the Vice President of Carnival

1  Cruise Line when you left in 2020?
2    A    I oversaw policies, procedures training,
3  shoreside security, ship security, criminal cases,
4  in a nutshell.
5    Q    Policies, procedures, shoreside security,
6  criminal cases, trainings, anything else?
7    A    Shipboard security.
8    Q    Shipboard security.
9         What else?
10    A    That's it in a nutshell.
11    Q    What about investigations?
12    A    The criminal side, yes.
13    Q    Okay.  And by criminal investigations
14  would that include rape and sexual assault?
15    A    Yes, sir.
16    Q    Okay.  And who reported to you?
17    A    Director -- when I retired?
18    Q    Yes, sir.
19    A    Director Arturo Loynaz.
20    Q    Arturo Munez?
21    A    Arturo Loynaz, L-O-Y-N-A-Z.
22    Q    L-O-Y-N-E-Z.
23    A    N-A-Z.
24    Q    N-A-Z?
25    A    Yes, sir.

Page 14

1    Q    And does Arturo still work -- did you say
2  Arturo?
3    A    I am sorry, what?
4    Q    Did you say his name was Arturo?
5    A    Arturo, yes.
6    Q    Does Arturo still work for Carnival?
7    A    Yes.  He took my place.
8    Q    So he is the current vice president of
9  security services for Carnival?
10   A    No, sir.  They eliminated the vice
11 president position during COVID.
12   Q    What is the position called now?
13   A    Senior director.
14   Q    Senior director.
15   Q    Did you -- just out of curiosity and I
16 hope you don't mind me asking, did you agree to
17 leave Carnival voluntarily or was your position
18 changed and --
19   A    Well, when they did the cutbacks during
20 COVID, I was, like, the oldest guy in the company
21 and they did cutbacks.  I was there 27 years and a
22 mutual agreement, you know, 27 years there, 20 plus
23 in law enforcement, it was enough.
24   Q    Okay.  So there were cutbacks due to COVID
25 and apparently, I guess, your position was

Page 15

1  essentially changed or eliminated and you decided to
2  retire?
3    A    Yes, sir.
4    Q    Okay.  And now you have a consulting
5  agency; is that correct?
6    A    Yes, sir.
7    Q    And what is that consulting agency called?
8    A    Excelsior Pros, Inc.  Excelsior
9  Professionals, Inc.
10   Q    Excelsior Professionals Pros, Inc.
11   A    Forget the pros.  It's Excelsior
12 Professionals, Inc.
13   Q    Can you spell Excelsior, please.
14   A    E-X-C-E-L-S-I-O-R.
15   Q    And what is your position with Excelsior?
16   A    I am the President.
17   Q    You are the president, so you founded the
18 company?
19   A    That's it.
20   Q    And I don't know what Excelsior does, but
21 I would venture to guess that Excelsior provides
22 consulting services for security issues?
23         MS. CABEZA:  Objection form.
24 BY MR. GERSON:
25   Q    Security services; is that correct?

Page 16

1         Why don't you tell me, what does Excelsior
2  do?
3    A    Anything from law enforcement to
4  testimony, cruise lines, whatever.  And as a matter
5  of fact, I am out there so I can do anything
6  connected to the cruise industry or law enforcement.
7    Q    Have you been -- has your company been
8  retained as an expert in the past to testify on
9  behalf of Carnival with respect to the security
10 services provided on Carnival cruise ships?
11   A    No --
12         MS. CABEZA:  Objection form.
13 BY MR. GERSON:
14   Q    You can answer.
15   A    No, I haven't.
16   Q    Okay.  When was your company formed?
17   A    Let's see.  I retired in 2020; worked for
18 a law firm when I retired; left there in 2020.  But
19 I really didn't get active until last year.
20   Q    Are you doing any consulting work for
21 Carnival?
22   A    No, sir.
23   Q    Are you doing any consulting work for any
24 of the cruise lines?
25   A    Yes, sir.

Page 17

1         MS. CABEZA:  Objection form.
2  BY MR. GERSON:
3    Q    What cruise lines are you providing
4  consulting work for?
5         MS. CABEZA:  Objection form.
6    A    Norwegian Cruise Line.
7  BY MR. GERSON:
8    Q    What others?
9    A    That's it right now.
10   Q    Have you been contacted by anyone from
11 Carnival to provide any consulting services on their
12 behalf?
13   A    Not yet.
14         MS. CABEZA:  Form.
15 BY MR. GERSON:
16   Q    If you were asked to provide any
17 consulting services for Carnival, would you?
18   A    Yes.
19         MS. CABEZA:  Objection form.
20 BY MR. GERSON:
21   Q    Yes?
22   A    Yes, I would.
23   Q    What is essentially -- does Excelsior have
24 a Website?
25   A    No, sir.

1  Q    And how many employees does Excelsior
2  employ?
3       A    Just me right now.
4       Q    And you mentioned that you were speaking
5  from a -- and I apologize for the name, it was a
6  funny name.  Shakeer I think you said his name was?
7       A    Sherif.
8       Q    Sherif.  Excuse me.
9            Sherif, is he an employee of your company?
10      A    No, sir.
11      Q    When you say that you provide consulting
12 services for NCL, tell me what type of consulting
13 you are doing for NCL currently?
14           MS. CABEZA:  Objection form.
15      A    Sexual screening.  Sexual predator
16 screening.
17 BY MR. GERSON:
18      Q    Sexual predator screening?
19      A    Sexual offender, yeah.
20      Q    Okay.  And tell me what does that mean?
21      A    That means it is a program that I did at
22 Carnival.  And we would screen the manifest prior to
23 sailing and compare it against the Department of
24 Justice sexual offender list and advise the company
25 that so and so has a conviction for a sexual

1  offense.
2       Q    Anything else?
3       A    That's it right now.
4       Q    If you were asked to provide a risk
5  assessment of the security protocols in place on a
6  Norwegian ship, is that something that you would be
7  capable of providing?
8       A    Yes.
9            MS. CABEZA:  Objection form.
10 BY MR. GERSON:
11      Q    Yes?
12      A    Yes, sir.
13      Q    Now you mentioned that sexual predator
14 offense -- sexual predator offender screening is
15 something that you are working with Norwegian right
16 now on a consulting basis, correct?
17      A    Yes.
18           MS. CABEZA:  Objection form.
19 BY MR. GERSON:
20      Q    And you also told me that that is a
21 program that you had in place at Carnival; is that
22 my -- is that a correct statement?
23           MS. CABEZA:  Objection form.
24      A    Yes, sir.
25

1  BY MR. GERSON:
2       Q    Was that a formal policy that was in
3  place?
4       A    Yes, sir.
5       Q    When did that -- when did the sexual
6  predator screening go into effect on Carnival ships?
7       A    2016.
8       Q    And why was a sexual predator screening in
9  2016 implemented on Carnival cruise ships?
10      A    A proactive measure to try to prevent any
11 further incidents along with other training we
12 implemented.
13      Q    Tell me about that.
14      A    About what?
15      Q    About the need to identify potential
16 sexual predators on cruise ships, Carnival cruise
17 ships, when you decided to implement this program
18 that you are referring to in 2016?
19      A    Why I did it?
20      Q    Yes.
21      A    To be proactive in the event that we had a
22 child molester, rapist, or whatever boarding our
23 vessel we would know or we would reject them from
24 sailing.
25      Q    At the time that you decided to implement

1  this sexual predator screener or screening, you, as
2  the Director of Security Services for Carnival -- or
3  excuse me, the Vice President of Security Services
4  for Carnival, understood that there was a problem
5  with sex crimes on cruise ships, including Carnival
6  cruise ships; did you not?
7            MS. CABEZA:  Objection form.
8       A    Well, you try to prevent as much as you
9  can of anything.  You know, the ships are like a
10 city.  So, say, I was in law enforcement, you know,
11 you patrol, you do what you can to prevent an
12 incident from happening.  And the screening seemed
13 to be a good policy to put in place along with the
14 training that we combined with it, which was with
15 RAINN.  And we did as much as we could with what we
16 had to prevent as much as we could.
17 BY MR. GERSON:
18      Q    Up until 2016 Carnival had no policy in
19 place for identifying potential sexual predators?
20           MS. CABEZA:  Objection form.
21      A    You know what, I am having a problem
22 hearing what Lauren is saying.
23 BY MR. GERSON:
24      Q    She is objecting to the form of the
25 question.

Page 22

```
1       A    Okay.
2       Q    And you should just answer the question as
3   if there is no objection.
4       A    Okay.
5       Q    It's just for the record.  Okay?
6       A    All right.  Thanks.
7            And what was the question again?
8       Q    Sure.
9            Prior to 2016 Carnival had no procedure in
10  place for identifying potential sexual predators
11  correct?
12           MS. CABEZA:  Same objection.
13      A    Not this type of screening, no.
14  BY MR. GERSON:
15      Q    And tell me, do you agree generally that
16  there are standards for safety and security
17  applicable to cruise ships that if implemented could
18  reduce the prevalence of rape, sexual assault on
19  cruise lines?
20           MS. CABEZA:  Objection form.
21      A    You could try the best you can, but it's
22  not going to stop human nature behind closed doors.
23  BY MR. GERSON:
24      Q    Okay.  And tell me what was the background
25  behind or the -- or the buildup that led to the
```

Page 23

```
1   decision to implement this program to address sex
2   crimes, including rape, sexual assault on cruise
3   ships?
4            MS. CABEZA:  Objection form.
5       A    Well, the Cruise Vessel Safety and
6   Security Act, a lot of measures were put in place.
7   A lot of good measures.  And you try to think out of
8   the box to do the best you can and this was a great
9   idea.
10  BY MR. GERSON:
11      Q    Okay.  And the Cruise Ship Vessel Safety
12  and Security Act, that was -- what is your
13  understanding of what that was?
14           MS. CABEZA:  Objection form.
15      A    To implement standards for certain crime
16  reporting, overboard cameras, there is several
17  different things in CVSSA.
18  BY MR. GERSON:
19      Q    Did you attend any of the hearings in
20  front of the Senate Commerce Committee when the
21  CVSSA was proposed to Congress?
22      A    I spoke to congressional staffers, not the
23  congressional meetings themselves.
24      Q    And when you said you spoke to
25  congressional staffers, you actually went to
```

Page 24

```
1   Washington, D.C. to speak with members of Congress
2   about CVSSA?
3       A    Staffers, yes.
4       Q    Okay.  Was the Cruise Ship Vessel Safety
5   and Security Act legislation that was drafted by
6   people within the cruise line industry?
7       A    We got together.  It was the Coast Guard
8   that was behind -- was the main push behind this
9   with the FBI.
10      Q    So you understand that the enactment of
11  CVSSA was legislation that was proposed by people
12  outside of the cruise line industry, such as -- or
13  non-cruise line companies, such as the Coast Guard
14  and the FBI, to address the growing concern and
15  problems with rape, sexual assault, and other
16  violent crimes occurring on cruises in foreign or
17  international waters, correct?
18           MS. CABEZA:  Objection form.
19      A    Yes, sir.
20  BY MR. GERSON:
21      Q    And did you oppose any of these safety or
22  security measures that were enacted by Congress as
23  part of CVSSA?
24      A    Did I oppose?  Not that I can recall.
25      Q    Prior to the enactment of CVSSA, did the
```

Page 25

```
1   cruise line -- were the cruise lines required to
2   maintain rape kits on its ships?
3       A    Yes, sir.
4       Q    Were they required or did Congress require
5   cruise lines to have rape kits on its cruise ships
6   as part of enacting the CVSSA in 2010?
7            MS. CABEZA:  Objection form.
8       A    The best I can recall it was internally
9   that we had rape kits on the ship.  It wasn't
10  mandated until CVSSA came out.  But we had rape kits
11  on the vessels.
12  BY MR. GERSON:
13      Q    Tell me who from Congress did you -- did
14  you ever attend any formal hearings as part of CVSSA
15  or --
16      A    No, sir.
17      Q    What members of Congress did you speak
18  with about its enactment?
19      A    They were staff members.  I couldn't tell
20  you their names.
21      Q    Did you understand as the Vice
22  President -- were you at the time CVSSA was enacted,
23  were you the Vice President of Security Services for
24  Carnival?
25      A    Yes, sir.
```

1    Q    Okay.  And at the time that CVSSA --

2    A    Now wait a minute.  Wait a minute.  I

3 think it was enacted in July of 2010.  I may have

4 been a senior director then.  I don't think I made

5 VP until the end of 2010.

6    Q    Okay.  So some time between twenty -- some

7 time in 2010?

8    A    Uh-huh.

9    Q    You were the Vice President of Security

10 Services for Carnival, correct?

11   A    Yes, sir.

12   Q    And then 2010 you were one of

13 Carnivals's executive -- executives that was

14 involved in addressing the Coast Guard and FBI's

15 attempts to reform cruise line reporting and other

16 safety security measures with respect to rape,

17 sexual assault, and other violent crimes on -- not

18 just Carnival cruise ships, but within the cruise

19 line industry?

20        MS. CABEZA:  Objection form.

21   A    Yes, sir.

22 BY MR. GERSON:

23   Q    And did you understand at the time when

24 CVSSA was enacted that the cruise lines were not

25 required to report rape or sexual assault or violent

1 crimes to any authority?

2        MS. CABEZA:  Objection form.

3    A    Were they formally required?  No, they

4 were required to report.

5 BY MR. GERSON:

6    Q    Well, what was your --

7    A    I think there -- I believe there is a -- I

8 am trying to remember.  I have been out of the lane

9 for quite a few years here, so bear with me.

10        There was reporting requirements listed

11 with the Coast Guard.  I cannot remember the

12 section.  It had to do with reporting felony

13 incidents.

14   Q    Okay.  And so the CVSSA was -- Carnival

15 understood at the time, or you understood as the

16 Director and also as the Vice President of Security

17 Services for Carnival in 2010, that the reason why

18 Cruise Ship Vessel Safety and Security Act of 2010

19 was passed was in order to focus on the well-being

20 of passengers with respect to violent crimes that

21 were occurring on cruise ships, including Carnival

22 vessels?

23        MS. CABEZA:  Objection form.

24   A    Yes, sir.

25

1 BY MR. GERSON:

2    Q    Okay.  And tell me how many cruise ships

3 were you -- were within Carnival's fleet at the

4 time CVS -- or strike that.

5        How many cruise ships did you oversee as

6 the Vice President of Security when you retired in

7 twenty -- well, let's say as of 2019?  Was it 26?

8    A    Great.  I am glad you reminded me.  Yes,

9 26.

10   Q    And all of the cruise ships within

11 Carnival's fleet -- we are just talking about

12 Carnival; we are not talking about any of its

13 subsidiaries:  Holland America, Princess -- your

14 focus was solely Carnival Cruise Line ships or were

15 you also responsible for implementing any policies

16 and procedures or changes in response to CVSSA on

17 behalf of any other Carnival entity?

18        MS. CABEZA:  Objection form.

19   A    We would have semi-annual meetings with

20 the corporate partners within Carnival and discuss

21 issues.  And then we would have meetings every 60

22 days with Cruise Line International security

23 meetings up in D.C.  So we collaborated internally

24 and externally with the industry.

25

1 BY MR. GERSON:

2    Q    Okay.  As a Senior Vice President or the

3 Vice President of Security Services for Carnival,

4 did you agree that there was a need for changes in

5 order to improve safety and security for passengers

6 on Carnival cruise ships and in the cruise line

7 industry in general?

8        MS. CABEZA:  Objection form.

9    A    When you say a need, I can tell you that

10 we reported everything at Carnival.  Whether it was

11 a need for the whole industry, I don't know if I

12 would use the word need.

13 BY MR. GERSON:

14   Q    What would you call it?

15   A    We reported everything.

16   Q    Okay.  Well, CVSSA was legislation that

17 was enacted in response to the growing concern about

18 the number of rapes, sexual assaults, and other

19 violent crimes that were occurring within the cruise

20 line industry, right?

21        MS. CABEZA:  Objection form.

22   A    Right.

23 BY MR. GERSON:

24   Q    Okay.  And who other than yourself was

25 involved with speaking with members from Congress

1  about CVSSA prior to its enactment?
2      A    Speaking to Congress or in my case the
3  staffers.  I mean, CLIA represented the industry
4  with Congress.
5      Q    And CLIA is what?
6      A    Cruise Line International Association.
7  They represent the industry.
8      Q    CLIA is comprised mainly of members or --
9  members of the cruise line industry, correct?
10     A    Yes, sir.
11     Q    Okay.  You understand that CVSSA required
12 cruise vessels that visited U.S. ports to meet
13 certain safety and security requirements that did
14 not exist prior to it being enacted, correct?
15     A    Correct.
16          MS. CABEZA:  Objection form.
17 BY MR. GERSON:
18     Q    And that included reporting allegations of
19 certain crimes to the FBI, correct?
20     A    Yes.
21          MS. CABEZA:  Objection form.
22 BY MR. GERSON:
23     Q    And what was your understanding of why
24 that was required?
25     A    It put in place mandatory reporting

1  policies for the industry.
2      Q    Okay.  And tell me what is your
3  understanding of the other requirements that CVSSA
4  mandated the cruise line industry, including
5  Carnival, with respect to rape and sexual assaults?
6          MS. CABEZA:  Objection form.
7      A    Other than criminal?  Is that --
8  BY MR. GERSON:
9      Q    Let's just talk about in the context of
10 rape and sexual assault prevention.
11     A    Can you repeat that question now.
12     Q    Sure.
13          What I am asking is, what are the other --
14 what were the other requirements, other than the
15 mandated reporting requirements to the FBI required
16 by CVSSA that you know of?
17     A    Mandatory rape kits in the infirmaries.
18 Camera coverage.
19     Q    Where was the camera coverage required?
20     A    Where was it required?
21     Q    Yes.
22     A    I believe they are coming out with that
23 requirement now.  Back then it was about overboard
24 capture and overboard incidents.  They left it up to
25 the cruise lines to place cameras, but I believe

1  now -- here again, I have been out of the lane for a
2  while -- that they are mandating areas where there
3  must be coverage.
4      Q    Okay.  So at the time CVSSA was enacted,
5  this is about where J.F.'s alleged rape and sexual
6  assault happened in 2019, and that would have been
7  about nine years since CVSSA was enacted, if it was
8  enacted in 2010, correct?
9      A    Yes, sir.
10          MS. CABEZA:  Objection form.
11 BY MR. GERSON:
12     Q    And at the time CVSSA was enacted,
13 Congress required that the cruise lines maintain
14 security cameras in areas of ships; is that what you
15 are telling me?
16          MS. CABEZA:  Objection form.
17     A    They didn't mandate internal cameras in
18 2010.  The mandate has to do with retention periods,
19 I believe, overboard capturing.  That's all I can
20 recall right now.
21 BY MR. GERSON:
22     Q    Prior to its enactment did the cruise
23 lines -- were the cruise lines required to offer
24 passengers the right to contact -- or United States
25 citizens access to the FBI?

1          MS. CABEZA:  Objection form.
2      A    Well, you are dating me here.  Required?
3  BY MR. GERSON:
4      Q    Prior to its enactment?
5      A    Was it required?  No, it was not required
6  but it was offered.
7      Q    Okay.  Are you aware of any penalties that
8  exist in the event that the cruise lines, such as
9  Carnival, don't comply with provisions of CVSSA?
10          MS. CABEZA:  Objection form.
11     A    I cannot remember what the penalties were
12 or are.  I just don't recall.
13 BY MR. GERSON:
14     Q    Okay.  Now you worked for Carnival for a
15 considerable period of time.  And I think you said
16 when you first started working for Carnival you
17 worked as an investigator?
18     A    Yes, sir.
19     Q    And how long -- just walk me through,
20 briefly if you would, your employment history
21 through Carnival up until your retirement?
22     A    My years and different positions?
23     Q    Yeah, just generally if you could to the
24 best that you can.  I mean, I know you already told
25 me that you were an investigator for a period of

1  time.  But just help me understand how you worked
2  your way up the ranks so to speak.
3      A    How did I work my way up the ranks?
4  Hopefully because I did a good job.  I started as an
5  investigator for a few years and then I became a
6  supervisor.  We took on more responsibilities way
7  back.  We started -- I started off thinking I was
8  learning a new field in the casino business.  My old
9  boss ran a casino detail in Atlantic City.  So I was
10 then looking for a change of pace in my life and
11 that changed.
12          I did some of the casino work for a couple
13 of years and then we took on shipboard security,
14 shoreside security, investigations.  And I got
15 promoted through the ranks because of the activity
16 and the assignments given to us.  I guess you would
17 call it a bigger span of control.
18     Q    Okay.  Prior to working as the vice --
19 prior to being hired as the Vice President of
20 Security Services, you were, I think you said, the
21 Director of Security?
22     A    Prior to VP I was the Senior Director.
23     Q    Prior to VP you were the Senior Director?
24     A    Yes, sir.
25     Q    And how were your duties and

1  responsibilities as the senior director different
2  from the -- as the vice president?
3      A    Well, as the vice president you were also
4  called the company security officer, which is
5  mandated in international law.
6      Q    Uh-huh.
7      A    So it's another hat that you wear with
8  more responsibility.
9      Q    Okay.  Going back to the CVSSA, Cruise
10 Ship Vessel Safety and Security Act of 2010, were
11 the cruise lines required to maintain security
12 cameras in the hallway corridors or corridors for
13 passenger staterooms?
14          MS. CABEZA:  Objection form.
15     A    They were not required.
16 BY MR. GERSON:
17     Q    And as a part of CVSSA was there any
18 requirement to increase the number of security
19 officers that were working security on Carnival
20 cruise ships that you are aware of?
21          MS. CABEZA:  Objection form.
22     A    In the CVSSA does it require to have more
23 security?
24 BY MR. GERSON:
25     Q    Yes.

1      A    I don't recall that being in there.
2      Q    Okay.  But it is your testimony that you
3  believe now that Carnival Cruise Line is beginning
4  to implement or install security cameras in the
5  stateroom corridors; is that correct?
6      A    The newer vessels --
7          MS. CABEZA:  Objection form.
8      A    (Continued) The newer vessels had more
9  cameras than the older vessels.
10 BY MR. GERSON:
11     Q    Okay.
12     A    They were being proactive.
13     Q    Are you familiar with the American -- are
14 you familiar with -- well, let me just go back into
15 a little bit of your background.
16          You mentioned before working for Carnival
17 you were a New York police officer; is that correct?
18     A    State Police.
19     Q    State Police?
20     A    Yes, sir.
21     Q    Okay.  And are you a certified security
22 professional?
23     A    Do I have a certificate?  No, sir.
24     Q    Yeah.
25          Do you hold any security licenses?

1      A    No, sir.
2      Q    Have you ever held a security license?
3      A    No, sir.
4      Q    Are you familiar with an organization
5  called As Is?
6      A    Yes, sir.
7      Q    What is As Is?
8      A    The Association of Industrial Security or
9  something like that.
10     Q    Are you or has Carnival ever been a member
11 of As Is?
12          MS. CABEZA:  Objection form.
13     A    Not me.  There could be people in the
14 company that are.
15 BY MR. GERSON:
16     Q    Okay.  Well, as the Director -- the Vice
17 President of Security Services were you ever a
18 member of As Is?
19     A    No.
20          MS. CABEZA:  Objection form.
21 BY MR. GERSON:
22     Q    No?
23     A    No, sir.
24     Q    Okay.  And what security certifications do
25 you hold aside from the fact that you were a New

Page 38

1   York State Police officer?
2          MS. CABEZA:  Objection form.
3       A   I am certified in the state of Florida in
4   law enforcement, too.
5   BY MR. GERSON:
6       Q   Tell me when you say you are certified as
7   a law enforcement officer, can you tell me what you
8   mean by that?
9       A   I went to a comparative compliance course
10  when I moved here and I was employed by the State
11  Attorney's office in Broward County as an
12  investigator.  So you had to be certified in law
13  enforcement.
14      Q   Okay.  Do you agree -- or generally
15  speaking the duties and responsibilities as a New
16  York State Police officer are different than those
17  of a security officer working on a cruise ship, do
18  you agree with that or disagree with that?
19          MS. CABEZA:  Objection form.
20      A   Are they similar; is that what you are
21  saying?  I am sorry.  Unfortunately the lawn mowing
22  people are outside my window and I cannot hear
23  everything.
24  BY MR. GERSON:
25      Q   Are the duties and responsibilities as a

Page 39

1   New York State Police officer when you were working
2   as a New Your State Police officer, are they
3   different from the duties and responsibilities of a
4   security officer working on a Carnival cruise ship?
5          MS. CABEZA:  Objection form.
6       A   More stringent than a state police.
7   BY MR. GERSON:
8       Q   Tell me why or how so?
9       A   Well, I was in charge of major crimes.  I
10  had to carry a weapon.  You had to wear a vest.
11  Just for starters that's all off the top of my head.
12      Q   You had --
13      A   Training.  More training, certifications
14  in different areas of crime, different courses
15  attended.
16      Q   Were there height and weight requirements
17  in order for you to be a New York State Police
18  officer?
19          MS. CABEZA:  Objection form.
20      A   Back in the day, yes.
21  BY MR. GERSON:
22      Q   What were they?  Do you know?
23          MS. CABEZA:  Objection form.
24      A   5 foot 10.
25

Page 40

1   BY MR. GERSON:
2       Q   And you were required to wear a uniform?
3          MS. CABEZA:  Objection form.
4       A   When you start, you wear a uniform, yes.
5   BY MR. GERSON:
6       Q   Okay.  And I imagine the uniform consisted
7   of a badge and perhaps a hat and the typical police
8   attire?
9          MS. CABEZA:  Objection form.
10      A   New York State Police doesn't wear badges.
11  BY MR. GERSON:
12      Q   Aside from the badge, police officers had
13  a formal uniform that was different from other
14  members of the public, correct?
15      A   Yes.
16          MS. CABEZA:  Objection form.
17  BY MR. GERSON:
18      Q   On Carnival cruise ships security
19  officers' uniforms are similar to that of other
20  regular crew members; would you agree with that
21  generally?
22      A   To a certain extent.
23      Q   They don't have -- they don't wear hats?
24  There is nothing indicating to anyone that a
25  security officer as opposed to someone working on

Page 41

1   the pool deck, they basically have a similar type of
2   uniform, correct?
3          MS. CABEZA:  Objection form.
4       A   They are labeled security.
5   BY MR. GERSON:
6       Q   Okay.  When you say they are labeled
7   security, what do you mean by that?
8       A   ID badges, epilates.
9       Q   But nothing on the shirt that says
10  security across the chest, right?
11          MS. CABEZA:  Objection form.
12      A   In the back.  I believe they had security
13  written on the back.
14  BY MR. GERSON:
15      Q   Okay.  Do you know what the height and
16  weight requirements were for a security officer
17  working on a Carnival cruise ship back in 2019?
18      A   There weren't any.
19      Q   Why not?
20          MS. CABEZA:  Objection form.
21      A   The requirements have been reduced over
22  the years everywhere, so I don't know what to tell
23  you.
24  BY MR. GERSON:
25      Q   Tell me what you mean by that?

Page 42

1    A    I don't know what to tell you.
2    Q    When you say what requirements --
3    A    You can't discriminate against a short
4  person, a heavy person.
5    Q    Well, when you were working as a member of
6  law enforcement for the New York State Police
7  Department there was a minimum height requirement of
8  5'10", correct?
9              MS. CABEZA:  Objection form.
10   A    Yes, sir.
11 BY MR. GERSON:
12   Q    And there is no comparable requirement for
13 a security officer working for Carnival, is there?
14             MS. CABEZA:  Objection form.
15   A    You are talking way back as opposed to
16 today's world.
17 BY MR. GERSON:
18   Q    Let's just talk about as of 2019.  There
19 wasn't any, okay, was there?
20             MS. CABEZA:  Objection form.
21   A    No.
22 BY MR. GERSON:
23   Q    And tell me what was -- as the Vice
24 President of Security Services for Carnival, what
25 were the requirements, the minimum requirements, for

Page 43

1  a security -- in order to be a security officer on a
2  Carnival cruise ship?
3              MS. CABEZA:  Objection form.
4    A    Prior experience in security, prior law
5  enforcement, English written and oral skills.  We
6  like to have people proportioned to their height,
7  but, again, you cannot discriminate.
8  BY MR. GERSON:
9    Q    Okay.  When you say prior experience in
10 security, if someone had -- do you know what the
11 minimum experience requirements were in order to
12 work for security on a Carnival cruise ship back in
13 2019?
14             MS. CABEZA:  Objection form.
15   A    Three years.
16 BY MR. GERSON:
17   Q    Three years?
18   A    Yes, sir.
19   Q    And if someone were to work security at
20 the airport screening luggage for drugs and
21 paraphernalia and maintained that position for three
22 years, would that qualify them for having the
23 requisite number of years of security background in
24 order to potentially work as a security employee on
25 a Carnival ship?

Page 44

1              MS. CABEZA:  Objection form.
2    A    Yes, that coupled with the training that
3  they get.
4  BY MR. GERSON:
5    Q    And when you say the training that they
6  get, what training was required that a security
7  officer possessed in order to work on a Carnival
8  cruise ship on the security team?
9              MS. CABEZA:  Objection form.
10   A    In 2019 we had, like, an academy in the
11 Philippines that all security had to attend.  I
12 cannot recall the length of the training.  It was --
13 I don't know if it was six weeks or whatever it was.
14 And it is like a mini police academy and there are
15 certain blocks of training, but they have to pass.
16        Once they pass that with their prior
17 experience, they go on board and then they are
18 assigned to a senior security officer.  There,
19 again, I cannot recall the length of time they
20 shadow the senior security officer.  And then they
21 make the decision whether or not they are good to go
22 on their own or need to go back to their country.
23 BY MR. GERSON:
24   Q    Why is it that Carnival Cruise Line had a
25 company in the Philippines providing training to

Page 45

1  potential security officers, as opposed to formal
2  training here in the United States, even Miami-Dade
3  County, with security professionals from As Is and
4  other leading security organizations?
5              MS. CABEZA:  Objection form.
6    A    It ended up being a corporate decision.
7  BY MR. GERSON:
8    Q    As a member -- you would agree that you
9  are part of that corporate decision-making process,
10 weren't you?
11             MS. CABEZA:  Objection form.
12   A    I am not the top dog.
13 BY MR. GERSON:
14   Q    I understand.
15        But certainly you had a voice in security
16 needs or changes, just as you told me that you were
17 involved in this policy to identify sexual
18 predators, right?
19             MS. CABEZA:  Objection form.
20   A    Right.
21 BY MR. GERSON:
22   Q    Okay.  Did you ever do anything to look --
23 well, strike that.
24        What did you do as a -- or what did your
25 security -- what did you do as director -- as the

1  Vice President of Security Services to evaluate the
2  curriculum and training that was provided by this
3  Philippines training that your security officers
4  would have to undergo before working on a Carnival
5  ship as a security officer.
6          MS. CABEZA: Objection form.
7      A   Well, corporate ran the mini academy or
8  whatever you want to call it.  And the semi-annual
9  meetings that we had with corporate, the sister
10 lines, we would suggest curriculum.  And it was
11 implemented that way.
12 BY MR. GERSON:
13     Q   What -- when you say we would suggest
14 curriculum, what was the name of the Filipino
15 institution that was providing this security
16 training for potential security officers?
17     A   It was called Magsaysay.
18     Q   Can you spell that please.
19     A   I think it's M-A-G-S-A-Y-S-A-Y.
20     Q   M-A-G-S-A-Y-S-A-Y.
21     A   Yes, sir.
22     Q   And do you know what the training
23 consisted of?
24     A   There was some physical training, report
25 writing, different scenarios that they acted out,

1  disorderly people, riot control, sexual assault.
2  There again, jogging my memory.
3      Q   Other than training in the Philippines,
4  did Carnival have any other places for security
5  officers to receive these trainings prior to
6  being -- prior to being hired as a security officer
7  on a Carnival cruise ship?
8          MS. CABEZA: Objection form.
9      A   Initially it was an on-the-job training
10 course that we had outlined that we developed within
11 Carnival Cruise Line, which covered a multitude of
12 report writing.  There, again, scenarios, different
13 scenarios from self-defense to investigative
14 techniques to evidence collecting.
15         And then every two years we would have an
16 in house in the United States training course for
17 ship security officers.  And by that I mean officers
18 ranked, like the staff captain and chief security
19 officers.  And in that course we would have the FBI,
20 Homeland Security, D.E.A., local police, federal air
21 marshals.
22         Internally we would conduct our own
23 training with the personnel in my office.  And, of
24 course, it was certified by MARAD, Maritime
25 Administration, that was part of the CVSSA.

1  Actually we were the first to get certified in the
2  industry.
3  BY MR. GERSON:
4      Q   As a director -- or Vice President of
5  Security Services for Carnival, how was the decision
6  made in terms of what a sufficient number of
7  security officers were needed in order to adequately
8  provide reasonable safety and security measures in
9  order to address the rape, sexual assault, and
10 violent crimes that had been occurring on cruise
11 ships prior to 2019?
12         MS. CABEZA: Objection form.
13     A   You are talking to a security guy that
14 always wanted more.
15 BY MR. GERSON:
16     Q   What is that based on?
17     A   Based on finance budgets, size of ships,
18 demographics, where they are sailing out of.  You
19 would do the best you can with what you had.
20     Q   As a security professional -- as a
21 security officer -- excuse me.  As a member of
22 Carnival's executive team or executives, you wanted
23 more security officers on Carnival cruise ships,
24 correct?
25         MS. CABEZA: Objection form.

1      A   And the last I heard that they are getting
2  them.  So I think they listened to me, but I am
3  gone.
4  BY MR. GERSON:
5      Q   Okay.  But before you were gone, you were
6  pressing Carnival or requesting that Carnival
7  increase the number of security officers on its
8  cruise ships, correct?
9          MS. CABEZA: Objection form.
10     A   Security people always want more security.
11 Law enforcements always wants more law enforcement.
12 BY MR. GERSON:
13     Q   Okay.
14     A   We had enough security to handle what we
15 had to handle.
16     Q   Okay.  And are you familiar with someone
17 by the name of Mike Panarello?
18     A   Yes, sir.
19     Q   It is my understanding he passed away?
20     A   That's correct.
21     Q   I am sorry to hear that.
22         Mr. Panarello -- how many times did
23 Mr. Panarello voice his request to have an increased
24 number of security officers on Carnival cruise ships
25 when he was working in his capacity as a member of

1  Carnival's security team?
2           MS. CABEZA:  Objection form.
3      A    Probably as many as I did.
4  BY MR. GERSON:
5      Q    How many times was that?
6      A    I have no idea.
7      Q    Too many to remember?
8           MS. CABEZA:  Objection form.
9      A    It was a long time ago, Counselor.
10 BY MR. GERSON:
11     Q    Well, in the years prior to 2019 there
12 were semi-annual meetings where members of the
13 security officers, assistant chief security
14 officers, would convene to address security issues
15 that they were experiencing with other senior
16 executives, correct?
17          MS. CABEZA:  Objection form.
18     A    Correct.
19 BY MR. GERSON:
20     Q    And at those meetings, isn't it true that
21 there had been concerns -- there had been requests
22 by not just Mr. Panarello but also the actual
23 security officers -- assistant chief security
24 officers that attended the meetings that they needed
25 more security officers on their ships?

1      A    They voiced their opinions.
2           MS. CABEZA:  Objection form.
3  BY MR. GERSON:
4      Q    Say that again?
5      A    They voiced their opinions.
6      Q    Okay.  And who attended those meetings?
7      A    During security meetings or conferences?
8      Q    At the conferences?
9      A    That would be myself, my staff, staff
10 captains, chief security officers, assistant chief
11 security officers.
12     Q    Did the assistant chief security officers
13 that were requesting additional security officers be
14 deployed on Carnival cruise ships, that occurred
15 while you were a Vice President of Security for
16 Carnival, correct?
17          MS. CABEZA:  Objection form.
18     A    I am not sure I understand what you mean.
19 BY MR. GERSON:
20     Q    Sure.
21          Between 2010 and the time that you retired
22 from Carnival, over that timeframe there had been a
23 request from the assistant security officers and
24 other people within the security services team for
25 Carnival that Carnival increase its security

1  personnel on its vessels, correct?
2      A    Yes.
3           MS. CABEZA:  Objection form.
4  BY MR. GERSON:
5      Q    And what did that mean to you?
6      A    It fell in line with what I always say.
7  You always want more.
8      Q    Do you agree that generally as someone who
9  has worked for -- as a member of law enforcement
10 for, I think you said, 20 some years prior to
11 working for Carnival, correct?
12     A    Correct.
13     Q    You agree that a function of security, an
14 important function of security, is deterrence?
15          MS. CABEZA:  Objection form.
16     A    Deterrence?  Sure.
17 BY MR. GERSON:
18     Q    If security officers are present or police
19 officers are preset in an area, that can have a
20 deterrability affect on someone that may be thinking
21 about committing a crime, correct?
22          MS. CABEZA:  Objection form.
23     A    In their presence.  It doesn't mean around
24 the corner something is not going to happen.
25

1  BY MR. GERSON:
2      Q    Understood.
3           So the more security officers that you
4  have in general on, say, a cruise ship, the more
5  security presence can be -- is potentially visible
6  to your passengers, correct?
7           MS. CABEZA:  Objection form.
8      A    That's correct.
9  BY MR. GERSON:
10     Q    Okay.  And so when the security
11 officers -- so you knew for about -- at least nine
12 years or so that there had been requests by
13 assistant chief security officers and Mr. Panarello
14 that they were -- they wanted more security
15 personnel on its ships.
16          And my question is, did you ever discuss
17 that with anyone that you reported to.
18          MS. CABEZA:  Objection form.
19     A    Yes, sir.
20 BY MR. GERSON:
21     Q    And they told you it wasn't in the budget?
22          MS. CABEZA:  Objection form.
23     A    Sometimes things go on deaf ears.  They
24 had other priorities that they are looking at.
25 Security nowadays, I would think, is a higher

Page 54

```
1   profile and they understand.  And it wasn't in the
2   budget.
3   BY MR. GERSON:
4       Q    How do you know that?
5       A    That is why we would assign different
6   numbers of security to different ships based on the
7   port that they are sailing out of, the demographics.
8   And it's a game of chess to make sure you have an
9   adequate amount of security on a high-profile ship,
10  let's say.
11      Q    And just for the record, I didn't get this
12  established.  What was your understanding of Mike
13  Panarello was?
14      A    He was my director at the time.
15      Q    So you reported to him?
16      A    I was the VP.
17      Q    Who reported to who?  I am sorry?  Oh, he
18  reported -- he was the director and he reported to
19  you?
20      A    Yes, sir.
21      Q    Okay.  So when -- did you ever send any
22  documentation to -- well, who would you have had
23  discussions with about the request by security
24  officers to have additional security personnel on
25  its ships during the time you were the Vice
```

Page 55

```
1   President of Security?
2            MS. CABEZA:  Objection form.
3       A    I answered to several different people in
4   those ten years, so.
5   BY MR. GERSON:
6       Q    Who was the last person as of 2019?
7       A    As of 2019 Lars Ljoen.
8       Q    Lars Ljoen.
9            And Mr. Ljoen, did you ever submit any
10  memos or written requests to document --
11      A    I could have done emails.  I am a
12  face-to-face person.
13      Q    Uh-huh.  Did you attend -- sorry.
14      A    No, go ahead.
15           I like face-to-face because you can tell
16  whether or not it is sinking in to the person you
17  are talking to.
18      Q    Did you feel like it was sinking in?
19           MS. CABEZA:  Objection form.
20      A    Yeah, to a certain extent.  Yes.
21  BY MR. GERSON:
22      Q    Did they ever increase the number of
23  security officers despite your request?
24      A    Yes, they did.
25           MS. CABEZA:  Objection form.
```

Page 56

```
1   BY MR. GERSON:
2       Q    When did they do that?
3            MS. CABEZA:  Objection form.
4       A    What year?
5   BY MR. GERSON:
6       Q    Yeah.
7       A    I have no idea.
8            We even formed, like, an auxillary group
9   in the event there was a large fight or something
10  like that.  We had people on call.  That is when we
11  started playing chess, like I was telling you,
12  demographically at the port of call, trouble ships
13  we would move security around, started adding more
14  security little by little.
15           And my understanding is they have really
16  increased it since I left.
17  BY MR. GERSON:
18      Q    Well, prior to your leaving, they didn't
19  increase the number of security officers on Carnival
20  cruise ships?
21      A    A couple of ships they did.
22      Q    Do you know which ones they increased?
23      A    No.
24      Q    Why would they have increased security
25  officers on a couple of ships as opposed to fleet
```

Page 57

```
1   wide?
2       A    Activity on the vessels.  When a ship goes
3   from port to port that absorbs a lot of
4   security.  That coupled with incidents occurring on
5   ship A is more than ship B, you would mathematically
6   add one or two more security.
7       Q    When you were working as Vice President of
8   Security, did you ever hire a company to -- strike
9   that.
10           Did you ever conduct a risk assessment of
11  Carnival ships that were within the 26 vessels of
12  Carnival's fleet in 2019 or prior to 2019?
13           MS. CABEZA:  Objection form.
14      A    You mean hire an outside vendor for the
15  assessment?
16  BY MR. GERSON:
17      Q    Yes.
18      A    No.
19      Q    How was the decision made about what a
20  sufficient number of security officers was in order
21  to adequately provide a safe number or an adequate
22  number of security officers in order to prevent
23  rape, sexual assault, and other violent crimes as
24  defined by the -- or any other violent crimes?
25           MS. CABEZA:  Objection form.
```

Page 58

1   A    There, again, based on port of calls, the
2   itinerary, demographics, coming up with different
3   types of training to be proactive.  I mentioned
4   earlier RAINN training to be certified by RAINN that
5   our on board staff and our shoreside staff knew what
6   they were doing on how to handle a sexual assault.
7   I mean, things like that were implemented.
8        And apparently, like I said, they listened
9   because my understanding is they are getting all
10  kinds of security now.
11   Q    Well, now we are four years later in 2023
12  and it's your testimony as a former vice president
13  of Carnival security that Carnival is now
14  undertaking measures to increase its security
15  presence on its ships?
16        MS. CABEZA:  Objection form.
17   A    What I am saying is they started when I
18  was there little by little with different ideas.
19  The auxillary backup teams, the more training,
20  moving security around based on the itineraries and
21  demographics, the incidents.  And little by little
22  they are doing it.
23  BY MR. GERSON:
24   Q    Did you --
25   A    They had big delay with this COVID stuff,

Page 59

1   so I don't know what's happened in the last couple
2   of years to be honest with you.
3   Q    When you said that you had made requests
4   to Mr. Lars Ljoen to increase the number of security
5   officers, you were told that it wasn't in the --
6   they didn't have -- it wasn't in the budget so to
7   speak?
8        MS. CABEZA:  Objection form.
9   A    It is not told to you that way.
10  BY MR. GERSON:
11   Q    How is it told?
12   A    At the end of the day you see the numbers
13  you put in for and you see the numbers you are
14  getting.
15   Q    How many additional security officers were
16  you requesting to work security on a Carnival cruise
17  ship with, say, 15 decks?
18        MS. CABEZA:  Objection form.
19   A    Now you really date me on that.  I don't
20  want to commit to a number.  But all I can tell you
21  is I did request more security.
22  BY MR. GERSON:
23   Q    How many times?
24        MS. CABEZA:  Objection form.
25   A    No idea.

Page 60

1   BY MR. GERSON:
2   Q    Who other than Lars did you request more
3   security prior -- during the time that you were
4   working as Vice President of Security for Carnival?
5   A    His predecessor, Martin Landman, he was
6   the -- I don't know if he was a senior VP or an EVP.
7   It goes back to other presidents that were there.  I
8   can't be factual on who, when, and where I requested
9   it.  But I can tell you that I did.
10   Q    All right.  Generally speaking over the --
11  between 2015 and 2019 you would have made requests
12  to your direct supervisors and other executives of
13  Carnival to increase the number of security officers
14  on all Carnival ships?
15        MS. CABEZA:  Objection form.
16   A    I wouldn't lock in to 2015.
17  BY MR. GERSON:
18   Q    Well, I am saying within at least that
19  duration of time, I am not saying 2015 specifically?
20        MS. CABEZA:  Objection form.
21   A    In my tenure as vice president I have
22  asked for more security, yes.
23  BY MR. GERSON:
24   Q    Okay.  And if you had more security
25  officers available to you -- well, strike that.

Page 61

1        How many more security officers were you
2   requesting on Carnival ships?
3        MS. CABEZA:  Objection form.
4   A    It would depend on the size of the vessel,
5   the itinerary, the activity.  I cannot give you a
6   number right now.
7   BY MR. GERSON:
8   Q    Okay.  Are you aware of -- well, if you
9   were requesting the number of security of officers
10  over the years that you were working as the Vice
11  President of Security to Carnival, you had some
12  basis and understanding of what the security actual
13  deployment schedules were on Carnival ships,
14  correct?
15        MS. CABEZA:  Objection form.
16   A    Correct.
17  BY MR. GERSON:
18   Q    And I know you make reference to different
19  ports and different vessels, but you would agree
20  generally, sir, that of all of Carnival's 26 ships,
21  they all have at least about a dozen decks and hold
22  thousands of passengers and thousands of crew
23  members, correct?
24        MS. CABEZA:  Objection form.
25   A    Correct.

1  BY MR. GERSON:
2      Q    If we were to look at the Carnival
3  Horizon, for instance, the Carnival Horizon as I
4  understand is a passenger ship that carried up to
5  3,960 passengers.  Does that sound correct?
6            MS. CABEZA:  Objection form.
7      A    I can't recall.
8  BY MR. GERSON:
9      Q    Well, I will represent -- does that sound
10  generally speaking?
11      A    I will take your word for it.
12            MS. CABEZA:  Objection form.
13  BY MR. GERSON:
14      Q    Okay.  And the -- are you familiar with --
15  well, strike that.
16            Generally speaking, what is your
17  understanding of the approximate number of security
18  officers that were working as security on a Carnival
19  vessel, such as the Horizon, just tell me generally
20  what that number was as you understood it.
21            MS. CABEZA:  Objection form.
22      A    Generally I believe 20.
23  BY MR. GERSON:
24      Q    Okay.  And of the 20, not all of those
25  security officers would work the same shift, would

1  they?
2            MS. CABEZA:  Objection form.
3      A    No, they would not.
4  BY MR. GERSON:
5      Q    And the reason why they couldn't all work
6  the same shift is because if you only have 20
7  security officers, all 20 couldn't work at the same
8  time because of just the number of hours of the day
9  and other labor laws that were in place, correct?
10      A    Correct.
11            MS. CABEZA:  Objection form.
12  BY MR. GERSON:
13      Q    So if you had 20 security officers on a
14  vessel, two of the security officers would hold
15  title, such as the assistant chief security officer,
16  correct?
17      A    Correct.
18            MS. CABEZA:  Objection form.
19  BY MR. GERSON:
20      Q    And the assistant chief security officer
21  would work one potential 12-hour shift and then the
22  other assistant chief security officer would work a
23  second 12-hour shift?
24            MS. CABEZA:  Objection form.
25      A    Yes.

1  BY MR. GERSON:
2      Q    And so then if we had roughly 20, that
3  would leave roughly nine security officers that were
4  actually the troops on the ground to patrol Carnival
5  vessels and act as security or provide security,
6  correct?
7            MS. CABEZA:  Objection form.
8      A    That would vary on the itinerary.  That
9  varies.  That is a whole scheduling issue.
10  BY MR. GERSON:
11      Q    What does the itinerary have to do with --
12  you know, ports of call?  What does a port of call
13  have to do with a problem, such as rape and sexual
14  assaults occurring on Carnival cruise ships?
15      A    Ports of calls you have gangways down.
16  You could have one down, two down, marshaling areas
17  open.  You need more security manning those
18  positions.  And then there is activity at the pools,
19  the hot spots where the bars are.  So it all depends
20  on the itinerary and the size of the ship.
21      Q    Okay.  Well, aside from the itinerary, so
22  if you had nine security officers that were working,
23  say, an eight- to 12-hour shift on, say, the
24  Carnival Horizon, wouldn't -- and the Carnival
25  Horizon consisted of 15 decks, you wouldn't have

1  enough security officers assigned to each deck,
2  would you?
3            MS. CABEZA:  Objection form.
4      A    No, that's why we have roving patrols.
5  BY MR. GERSON:
6      Q    What do you mean by that?
7      A    Officers that would go from deck to deck
8  and hit hot spots per se.
9      Q    What is a hot spot?
10      A    Say a bar where there is heavy drinking or
11  the pool area where everybody is having fun and you
12  have security in those places.
13      Q    Okay.  But my question was, that you would
14  agree just based on the numbers, if you have 15
15  decks on a Carnival cruise ship and you only have
16  nine security officers available, aside from the
17  assistant chief security officer, even if we were to
18  call it ten, you wouldn't have a -- you wouldn't
19  have one security officer per deck that could patrol
20  or have a dedicated security officer for each deck,
21  did you?
22            MS. CABEZA:  Objection form.
23      A    Like I told you, more security is better,
24  but you could have 100 security people, 100 law
25  enforcement officers, and an incident can happen.

1   BY MR. GERSON:
2        Q    Understood.  But --
3        A    In this case I don't even know where this
4   incident happened, if it was behind closed doors or
5   in a public area or whatever.  I just don't know
6   this case.
7        Q    Okay.  If you had -- how many more
8   security officers were you requesting generally
9   knowing that the average deployment schedule for
10  security officers was approximately 20?
11       A    I can't remember the numbers that I
12  requested back then.  Probably a half a dozen more I
13  would assume.  More is the better.  You ask for more
14  and if you meet halfway, you are happy.
15       Q    So if you had half a dozen more security
16  officers, that would be roughly three additional
17  security officers per shift?
18            MS. CABEZA:  Objection form.
19       A    Again, you could have a hundred more
20  security officers and it wouldn't stop a crime.
21  BY MR. GERSON:
22       Q    I understand.
23       A    Certain crimes.
24       Q    Understood.  Not all crimes can be
25  prevented; however, you do agree generally that more

1   security -- it is better to have too many then too
2   few, correct?
3            MS. CABEZA:  Objection form.
4        A    Sure.
5   BY MR. GERSON:
6        Q    Now you mentioned something about hot
7   spots, right?
8        A    Yes, I did.
9        Q    Based on your training and experience
10  working as the Vice President of Security -- strike
11  that.
12            How many rape and sexual assault
13  investigations would you say you signed off on or
14  were aware of on Carnival cruise ships in the ten
15  years prior to J.F.'S rape.
16            MS. CABEZA:  Objection form.
17       A    No idea.
18  BY MR. GERSON:
19       Q    Hundreds?
20            MS. CABEZA:  Objection form.
21       A    Hundreds?  First of all, we are talking
22  about allegations, correct?
23  BY MR. GERSON:
24       Q    Yes.
25       A    All right.  And how many -- what is the

1   timeframe?  Ten years?
2        Q    Say ten years?
3        A    One hundred let's say?  I would be
4   guessing at the number.
5        Q    Could it be more than hundreds?
6        A    It could be less.
7        Q    Okay.  And of the 100 or so that you were
8   aware of generally that you testified that you -- I
9   understand that you can't give me an exact number,
10  but let's --
11       A    I am not saying 100.
12       Q    Okay.  Let's say you were at least
13  aware of -- you are aware of at least 100 reported
14  rapes or sexual assaults that occurred on Carnival
15  cruise ships during the time that you were the Vice
16  President of Security for Carnival, correct?
17            MS. CABEZA:  Objection form.
18       A    I will not commit to that number of 100.
19  BY MR. GERSON:
20       Q    Okay.  Do you think 100 is a large number?
21       A    I don't recall.
22       Q    Okay.
23       A    It's been awhile, Counselor.
24       Q    Okay.  Okay.  Of the -- let's just say
25  aside from holding you to the number, of the number

1   of times that you were made aware of a rape or a
2   sexual assault on a Carnival cruise ship, do you
3   agree generally for the most part the rapes and the
4   sexual assaults were occurring in -- or being
5   reported to have alleged in the staterooms?
6            MS. CABEZA:  Objection form.
7        A    The majority.
8   BY MR. GERSON:
9        Q    Okay.  And how many different decks -- it
10  is my understanding on, say, the Carnival Horizon,
11  there is one, two, three, four, five, six, seven,
12  eight, nine, approximately ten decks on the Carnival
13  Horizon that had staterooms?
14            MS. CABEZA:  Objection form.
15  BY MR. GERSON:
16       Q    Does that sound accurate?
17       A    I am assuming.
18       Q    Okay.  Well, I don't want to -- I am not
19  trying to trick you or anything.  So let me --
20       A    I know.  I just can't remember.
21       Q    Let me just show you the deck plans for
22  the Carnival Horizon.
23            Do you see what is on your screen?
24       A    Yep.
25       Q    Okay.  So taking a look at the Carnival

1   Horizon we have got a total of 15 decks, correct?

2     A   Yes.

3     Q   Okay.  And you recognize -- you have seen

4   these deck plans I imagine during your tenure as the

5   Vice President of Security for Carnival?

6     A   Yes.

7     Q   And deck one has staterooms, correct?

8     A   Yes.

9     Q   Just do me a favor and count up the number

10  of decks that have staterooms on the Horizon.

11    A   Let's see.  One, two, three, four, eight,

12  12.

13    Q   Twelve?

14    A   By the looks of it, yeah.

15    Q   And then you mentioned you understood as

16  the Vice President of Security for Carnival that

17  most of the rapes and sexual assaults that had been

18  occurring or reported had occurred in staterooms by

19  either passengers or even crew members, correct?

20    A   I would say so.

21    Q   Okay.  And then rape and sexual assault

22  isn't the only type of a crime that was occurring on

23  Carnival cruise ships, was it?

24          MS. CABEZA:  Objection form.

25    A   No.

1  BY MR. GERSON:

2    Q   Okay.  There have also been -- Carnival

3  has an open drink policy or a free drink package,

4  correct?

5          MS. CABEZA:  Objection form.

6    A   Free drinks?

7  BY MR. GERSON:

8    Q   There is like a --

9    A   There is a drink package.

10    Q   A drink package so to speak?

11    A   Yeah, they have a drink package.

12    Q   Okay.  And then so, Carnival also has

13  nightclubs on its ships, correct?

14    A   Correct.

15    Q   And then isn't it true that security

16  officers would have security posts in the nightclubs

17  while the nightclubs were operating?

18          MS. CABEZA:  Objection form.

19    A   Yes.

20  BY MR. GERSON:

21    Q   And the Carnival nightclubs could have up

22  to three to four security officers just assigned to

23  the nightclub during the evening hours into the late

24  morning hours, depending on if the nightclub is

25  operating, correct?

1          MS. CABEZA:  Objection form.

2    A   Yeah, they adjust depending on the

3  activity.

4  BY MR. GERSON:

5    Q   Well, there is actually --

6    A   That is not necessarily true that you

7  would have six security officers there all night

8  long.

9    Q   Well, I didn't say six security officers.

10    A   I am throwing that number out.

11    Q   Okay.  But there is a deployment schedule

12  for security officers --

13    A   Yes, sir.

14    Q   -- that would be provided to the members

15  of the security team on a Carnival ship, such as the

16  Horizon, that would tell them where they are

17  supposed to be assigned to, such as the nightclub or

18  some other deck, correct?

19    A   Correct.

20          MS. CABEZA:  Objection form.

21  BY MR. GERSON:

22    Q   And why wasn't more -- if Carnival

23  understood or if you knew that a majority of the

24  rapes and sexual assaults that were being reported

25  on Carnival cruise ships occurred in the staterooms,

1  why doesn't -- why didn't Carnival do anything to

2  increase security presence in the stateroom

3  corridors during the evening hours when passengers

4  may be returning to their cabins or even minors

5  might be returning to their cabins if Carnival knows

6  that is an area where the -- most likely area where

7  rape and sexual assault is likely to occur?

8          MS. CABEZA:  Objection form.

9    A   Like I mentioned, they had roving patrols.

10  And I guess you can boil it down to the training of

11  other crew members.  See something, say something.

12  They are mandated to contact security if they see

13  anything out of the norm.

14  BY MR. GERSON:

15    Q   Well --

16    A   Although you don't have a security person

17  in that hallway, you could have a housekeeping

18  person, a linen person, a mail boy, or whatever.

19    Q   Are you telling me that because -- or

20  Carnival's position was that in light of the fact

21  that it didn't have enough security officers to

22  staff and man the passenger corridors in the evening

23  hours or early morning hours, that other members of

24  Carnival's -- other Carnival employees, such as the

25  housekeepers and the bellmen, were capable of

1  providing security?

2          MS. CABEZA:  Objection form.

3      A   I wouldn't say that is the reason why they

4  were trained to do that.  Here again, Carnival was

5  proactive, always wanted to do the right thing, so

6  whether it's drug usage, see something, something

7  terrorists, see something say something; normal crew

8  members are trained to assist in any safety and

9  security measure that they could see.  It has

10  nothing to do with the lack of security.

11  BY MR. GERSON:

12      Q   Well, Carnival didn't have -- strike that.

13          The security schedules that were in place,

14  you are familiar with those, correct?

15      A   Yes.

16      Q   Were you responsible for assigning the

17  security schedules?

18      A   No.

19      Q   Who developed the security schedules that

20  would have been in place on, say, the Carnival

21  Horizon?

22      A   The staff captain and the chef security

23  officer.

24      Q   The staff captain and the chief security

25  officer?

1      A   Yes.  They are assisted by their

2  assistants too.

3      Q   And what did you, as director of security,

4  do to evaluate the schedules to determine whether or

5  not there were security officers that were available

6  were being utilized in the most reasonable way to

7  try to reduce or prevent rape and sexual assault?

8          MS. CABEZA:  Objection form.

9      A   Well, here again, you are relying on your

10  staff captain who is the true ship security officer

11  under the IMO on his ability and the chief security

12  officers ability and periodically investigators from

13  my office would go on a working cruise, whether they

14  are investigating something or doing an audit, and

15  they would assess placement of security and come up

16  with recommendations.

17  BY MR. GERSON:

18      Q   Okay.  So you as the director of security

19  for Carnival, Carnival, you as vice president,

20  relied on the staff captain and the chief security

21  officer to determine what the security deployment

22  schedule was for each vessel and the assignments for

23  the security officers?

24          MS. CABEZA:  Objection form.

25      A   Basically delegating the authority to

1  them, correct.

2  BY MR. GERSON:

3      Q   Okay.  And did you ever review the

4  security schedules?

5      A   Yes.

6      Q   Did you ever make any recommendations to

7  change the security schedules in order to, say,

8  provide more patrols in the passenger corridor areas

9  during the early morning hours when the ship was at

10  sea?

11          MS. CABEZA:  Objection form.

12      A   I am sure I made suggestions over the

13  years.  I am sure my staff have made suggestions.

14  BY MR. GERSON:

15      Q   And who were the suggestions would have

16  been made to?

17      A   The vessel.

18      Q   And do you know whatever happened if you

19  made a suggestion?

20      A   They would do it.

21      Q   Did you ever make any changes to

22  increase -- or did you make any recommendations to

23  increase the security presence in stateroom areas or

24  corridor areas where the staterooms are located?

25          MS. CABEZA:  Objection form.

1      A   There's a good chance I have.  I just

2  can't recall.

3  BY MR. GERSON:

4      Q   Do you know if those changes were ever

5  implemented?

6          MS. CABEZA:  Objection form.

7      A   You are dating me, Counselor.  I am sure

8  they were if I told them to do it.  They were very

9  respectful to my wishes.

10  BY MR. GERSON:

11      Q   If you had been making requests to

12  increase the number of security officers on Carnival

13  ships while you were the Vice President of Security,

14  do you think it would be -- it wouldn't be

15  unreasonable to have more security officers; would

16  it have been?

17          MS. CABEZA:  Objection form.

18      A   The more the better no matter what.  If I

19  had a hundred, I would want 120.

20      Q   Does Carnival need 120 security

21  officers --

22      A   No.

23      Q   -- in order to safely --

24      A   No.

25      Q   -- provide security on ships --

Page 78

```
1         A    No.
2         Q    -- to prevent rapes or sexual assaults?
3         A    Not at all, no.
4              MS. CABEZA:  Objection to form.
5    BY MR. GERSON:
6         Q    Okay.  So we already know -- you have
7    already told me that you think somewhere in the
8    neighborhood of half a dozen security officers would
9    have been -- it was justified and you had actually
10   requested from executive members or management that
11   you reported to, including Mr. Lars Ljoen, while you
12   were the Vice President of Security, correct?
13             MS. CABEZA:  Objection form.
14        A    Where did the half dozen come up again?
15   BY MR. GERSON:
16        Q    You came up with the half a dozen.
17        A    Well, how did I come up with that?
18        Q    I don't know.
19        A    Well, I don't want to commit to numbers
20   without understanding this question.
21        Q    Would it have been unreasonable to have
22   two security officers on each deck and one --
23   including one security officer assigned to the
24   passenger corridor areas in the evening between,
25   say, 12:00 and 5:00 a.m.?
```

Page 79

```
1              MS. CABEZA:  Objection form.
2         A    Depends on the vessel.
3    BY MR. GERSON:
4         Q    Well --
5         A    And the interior.  Actually the Horizon is
6    one of the newer vessels; I think they have a lot of
7    cameras on the Horizon.
8         Q    Well, there are no cameras in the
9    passenger corridor areas, right?
10        A    Not on the Horizon?
11             MS. CABEZA:  Objection form.
12        A    (Continued)  That I don't remember.
13   BY MR. GERSON:
14        Q    Would it have been unreasonable to have a
15   security officer posted in the passenger corridor
16   areas between 12:00 and 5:00 a.m. if Carnival knew
17   that there was a -- there had been a pattern of
18   rapes and sexual assaults that were occurring on its
19   ships over a number of years?
20             MS. CABEZA:  Objection form.
21        A    If there was a pattern and it was a high
22   profile vessel, the schedule would have been shifted
23   to have more security in the hallways, more roving
24   patrols, more eyes and ears.
25
```

Page 80

```
1    BY MR. GERSON:
2         Q    Why is that good?
3         A    Preventable.
4         Q    Well, you did understand that when CVSSA
5    was enacted -- was the reason why CVSSA was enacted
6    was because of a problem that was acknowledged by
7    Congress with respect to the need to improve the
8    security measures on cruise ships, in particular to
9    prevent rape and sexual assault on female passengers
10   on its vessels?
11             MS. CABEZA:  Objection form.
12        A    Well, that's why it was implemented, yes.
13   BY MR. GERSON:
14        Q    Okay.  And it wasn't just Carnival --
15        A    Other crimes and overboard reporting.
16        Q    Right.  And it wasn't just Carnival, it
17   was the cruise line in general, correct?
18        A    That's correct.
19        Q    And that is something that you knew along
20   with other members of the executive security team or
21   executives of Carnival back in 2010?
22             SKWRAO:  Objection form.
23        A    We were very proactive in my tenure at
24   Carnival.
25
```

Page 81

```
1    BY MR. GERSON:
2         Q    But my question is, in that knowing that
3    and knowing from the legislation that was passed by
4    Congress with respect to the Cruise Ship Vessel
5    Safety and Security Act, Carnival never did anything
6    to increase its security presence in the passenger
7    corridor areas, even though it wasn't something that
8    was legally required by CVSSA?
9              MS. CABEZA:  Objection form.
10        A    We had adequate security.
11   BY MR. GERSON:
12        Q    And what is adequate security?
13        A    Enough to patrol the vessel.
14        Q    And what is enough?
15        A    Again, you are talking to a security
16   person.  You are talking to former law enforcement.
17        Q    I understand that.
18        A    I always want more.  So if I commit to a
19   number of 25, I would be happy if they gave me 35.
20        Q    Okay.  Well --
21        A    I really can't give you a hard, full
22   answer on that question.
23        Q    Okay.  But you agree that 20 security
24   officers, approximately nine per shift, on a
25   passenger vessel with 4,000 or so passengers isn't
```

Page 82

1  enough?
2            MS. CABEZA:  Objection form.
3     A   I didn't say that.
4  BY MR. GERSON:
5     Q   Is it your testimony that it is enough?
6            MS. CABEZA:  Objection form.
7     A   There is never -- there is never enough.
8  BY MR. GERSON:
9     Q   You agree that there was -- Carnival could
10 be doing more in providing security on its vessels,
11 such as having more security officers?  And I am not
12 suggesting 100, but it could be doing more than --
13 it could be providing more than it was providing?
14        MS. CABEZA:  Objection form.
15    A   And, again, we started this auxillary
16 team, eyes and ears.  And eventually, like I said,
17 from what I am hearing they are now putting more
18 security on the vessels.
19 BY MR. GERSON:
20    Q   Why is it now they are putting more
21 security officers on the vessels, but they weren't
22 putting more security officers on the vessel back in
23 2019 and in the four or five years before then?
24        MS. CABEZA:  Objection form.
25    A   Why?  Hmm.  Maybe it is the bureaucracy of

Page 83

1  gettings things done in a corporate world.  I don't
2  know.
3  BY MR. GERSON:
4     Q   You mentioned something about budgets?
5     A   Everyone has a budget.
6     Q   What was the security budget?
7            MS. CABEZA:  Objection form.
8     A   I cannot recall.
9  BY MR. GERSON:
10    Q   The budget was a finite number that you
11 had available in order to deploy fleet wide in
12 determining various security needs and services,
13 including security officers; is that correct?
14    A   Correct.
15        MS. CABEZA:  Objection form.
16 BY MR. GERSON:
17    Q   And where did the budget come from?  Who
18 determined what the budget was?
19    A   Our finance people.
20    Q   Okay.  And so if you were given a budget,
21 can you give me a hypothetical of what your security
22 budget was for fiscal year of, say, 2018?
23        MS. CABEZA:  Objection form.
24    A   I don't even want to guess.
25

Page 84

1  BY MR. GERSON:
2     Q   Roughly?
3            MS. CABEZA:  Objection.
4     A   I am not going to guess.
5  BY MR. GERSON:
6     Q   So you were essentially limited with the
7  financial resources that you had available in order
8  to make the security changes that were needed in
9  order to increase the security officers on Carnival
10 ships?
11        MS. CABEZA:  Objection form.
12    A   You are limited.
13 BY MR. GERSON:
14    Q   How much were you limited by?
15        MS. CABEZA:  Objection form.
16    A   I can't recall, Counselor.
17 BY MR. GERSON:
18    Q   Did you ever have anyone do some sort of
19 financial analysis of what it would cost to have
20 half a dozen security officers on -- deployed on 26
21 Carnival ships?
22        MS. CABEZA:  Objection form.
23    A   That's all done by finance.
24 BY MR. GERSON:
25    Q   Over the years you have investigated a

Page 85

1  number of reported rapes and sexual assaults on
2  Carnival vessels.  We already established that,
3  right?
4            MS. CABEZA:  Objection form.
5     A   Allegations, yes.
6  BY MR. GERSON:
7     Q   Okay.  And based on your training and
8  experience investigating rapes and sexual assaults
9  on cruise ships, is it uncommon that rapes and
10 sexual assaults aren't reported on the vessel when
11 the incident occurs?
12        MS. CABEZA:  Objection form.
13    A   It has happened.  Late reporting, yes, it
14 has happened.
15 BY MR. GERSON:
16    Q   Okay.  And what is late reporting?
17    A   They get off the vessel and then they
18 report to a local law enforcement or maybe they call
19 the FBI, maybe they call the Coast Guard.  Maybe
20 they called our office and reported it after the
21 fact.
22    Q   So it's not -- so by late reporting it is
23 not uncommon for there to be late or delayed
24 reporting of a rape or sexual assault by a passenger
25 on a Carnival ship based on your experience?

Page 86

1          MS. CABEZA:  Objection form.
2     A    It is not common but it happens.
3  BY MR. GERSON:
4     Q    **What is your understanding as the Vice**
5  **President of Security of why that happens sometimes?**
6     A    Why is there late reporting?
7     Q    **Yes.**
8     A    It could be anything.  The trauma that the
9  person went through, male or female.  It could be
10 anything.
11    Q    **Trauma?**
12    A    It could be.  Traumatized from the
13 allegation.  Sometimes people get veneral diseases
14 and report.  Sometimes people get pregnant and
15 report.
16    Q    **Sometimes passengers can be scared to**
17 **report?**
18    A    That is what I mean by --
19         MS. CABEZA:  Objection form.
20 BY MR. GERSON:
21    Q    **You understand as the Vice President of**
22 **Security for Carnival that sometimes passengers**
23 **don't -- including minors, may delay reporting a**
24 **rape or sexual assault based on trauma or**
25 **embarrassment perhaps?**

Page 87

1     A    That is possible.
2          MS. CABEZA:  Objection form.
3  BY MR. GERSON:
4     Q    **Not uncommon.**
5     A    It is not that common but it has happened.
6     Q    **Okay.  And as a member of the security**
7  **team, does that -- or as a member -- as the Vice**
8  **President of Security the fact that someone delays**
9  **their reporting of rape or sexual assault, does that**
10 **influence you as the Vice President of Security in**
11 **terms of whether or not that person is being**
12 **truthful?**
13         MS. CABEZA:  Objection form.
14    A    Not at all.
15         MS. CABEZA:  Can we take a
16    five-minute break whenever you hit a
17    stopping point?
18         MR. GERSON:  Sure.
19 BY MR. GERSON:
20    Q    **Did Carnival ever -- I think you told me**
21 **Carnival never hired an independent company to**
22 **evaluate.  Do you know what a risk assessment is?**
23    A    Yes.
24    Q    **To your knowledge Carnival never hired a**
25 **third-party to conduct a risk assessment in order to**

Page 88

1  address rape, sexual assault, and other crime
2  prevention on its cruise ships?
3          MS. CABEZA:  Objection form.
4          MR. GERSON:  Did the witness
5     freeze?
6          THE VIDEOGRAPHER:  I think so.
7     I was wondering but I think so.
8          He is definitely frozen,
9     Counsel.  Do you want me to get us off?
10         MR. GERSON:  Sure.
11         THE VIDEOGRAPHER:  Off the
12    record 11:52 a.m.
13         (Whereupon, a short recess was
14    taken.)
15         THE VIDEOGRAPHER:  On the record
16    12:01 p.m.
17    CONTINUATION OF DIRECT EXAMINATION
18 BY MR. GERSON:
19    Q    **Okay.  Mr. Froio, what I was asking you**
20 **was during your tenure working as the Vice President**
21 **of Security Services for Carnival, did you ever hire**
22 **or to your knowledge did Carnival ever hire a**
23 **third-party company to provide some sort of risk**
24 **assessment of the security needs and security**
25 **vulnerabilities, if any, on Carnival cruise ships?**

Page 89

1          MS. CABEZA:  Objection form.
2     A    That is where we got cut off.  I was
3  answering you, too.
4          I hired RAINN, rape crisis out of D.C., to
5  do an audit of our sexual assault practices.  As far
6  as the security assessment we have internal auditors
7  in corporate that would come out and do a security
8  assessment.  So as far as a third party, other than
9  RAINN, no.
10    Q    **What is RAINN?**
11    A    It's rape crisis out of Washington.  It is
12 the number one rape crisis organization in the
13 United States.
14    Q    **Is it your testimony that Carnival was a**
15 **member of RAINN back in 2019?**
16    A    Yes.
17         MS. CABEZA:  Objection form.
18 BY MR. GERSON:
19    Q    **And what is -- the fact that you were a**
20 **member of RAINN, what was your understanding of what**
21 **RAINN was and why did Carnival become affiliated**
22 **with it?**
23         MS. CABEZA:  Objection form.
24    A    RAINN certifies you that your practices
25 for handling sexual assault are adequate.  And they

**Page 90**

```
 1   collaborate with security, the care team, loss
 2   prevention, medical team to make sure everyone is in
 3   tune on how to handle an investigative sexual
 4   assault.  We get certified -- RAINN I think back in
 5   maybe 2016 for the first time and then 2018 again.
 6   It's like every two years we will get a
 7   certification.  And they would go ship to ship and
 8   they would also come into the main office and go
 9   through department to department to see how we
10   handled things.
11           So it is an audit specific to sexual
12   assault.
13   BY MR. GERSON:
14       Q   Well, the audit that you are referring to
15   by RAINN, did RAINN evaluate the number of security
16   officers that were deployed on Carnival cruise
17   ships?
18       A   It could have.
19       Q   As you sit here today, do you know if they
20   did?
21           MS. CABEZA:  Objection form.
22       A   I cannot recall, Counselor.
23   BY MR. GERSON:
24       Q   Okay.  Well, you already told me that you
25   personally had requested more security officers on
```

**Page 91**

```
 1   Carnival cruise ships and that your request
 2   essentially had been ignored?
 3           MS. CABEZA:  Objection form.
 4       A   I guess you could call it ignored at the
 5   time, but they did come through with other measures.
 6   BY MR. GERSON:
 7       Q   Well, not increasing the number of
 8   security officers?
 9           MS. CABEZA:  Objection form.
10       A   That's not true.  I did say that if we had
11   a high profile ship we added more security to that
12   vessel.  Get them off of vacation and bring them on
13   board.
14           Sometimes if you have a ship, let's say
15   that is quiet, hypothetically Alaska, would they
16   need a lot of security compared to a ship sailing
17   out of Miami or Long Beach, not necessarily.  Here
18   again, itinerary driven we were pulling maybe one or
19   two security from quiet ships to the more
20   high-profile ship.
21   BY MR. GERSON:
22       Q   Well, we have already --
23       A   I wouldn't say ignored.  But timely, I
24   think it's a play on words, Counselor.
25       Q   Well, you told me that what's been going
```

**Page 92**

```
 1   on -- your understanding is now Carnival is
 2   increasing its security officers on its ships but it
 3   hadn't followed through with multiple requests from
 4   you and other members of the security team in the
 5   years prior?
 6           MS. CABEZA:  Objection form.
 7       A   We implemented different procedures.
 8   BY MR. GERSON:
 9       Q   Okay.  Well --
10       A   See something, say something.  The
11   auxiliary backup team.
12       Q   Well, in order --
13       A   Low-profile ships, reduce the security
14   there and put it on a high-profile ship.  So I can't
15   say that nothing was done, not was it totally
16   ignored.
17       Q   Did RAINN make a recommendation that you
18   increase the number of security officers?
19       A   No, actually they said we did a fabulous
20   job.
21       Q   Excuse me?
22       A   Actually they said we did a great job.
23       Q   What information were you providing them?
24       A   We conduct investigations, patrols, rape
25   kits in the infirmaries, care after an allegation.
```

**Page 93**

```
 1       Q   Were you providing them statistical data
 2   with the number of rapes and sexual assaults and
 3   other violent crimes that had been occurring on
 4   Carnival vessels?
 5           MS. CABEZA:  Objection form.
 6       A   Sexual cases?
 7   BY MR. GERSON:
 8       Q   Sexual cases?
 9       A   And that is on a public Website.
10       Q   Okay.  Well, the public Website that you
11   are referring to, you referring to statistical data
12   required to be -- that's on the Department of
13   Homeland Security?
14           MS. CABEZA:  Objection form.
15       A   Is it Homeland Security now?  I thought it
16   was under -- it was under the Coast Guard at one
17   time and then MARAD.  It could be Homeland Security.
18   BY MR. GERSON:
19       Q   Well, whatever -- wherever it is, is that
20   the statistical data that you are referring to?
21       A   One of them.
22       Q   Okay.  And that statistical date, that is
23   information that only applies to Carnival vessels
24   that touch U.S. ports, correct?
25       A   Correct.
```

1    Q    Other than -- when you say that there were
2    audits that were conducted, what were the names of
3    the audits that were being conducted that would
4    evaluate the security needs of Carnival vessels?
5         MS. CABEZA:  Objection form.
6    A    The name of the audit, I have no idea.
7    BY MR. GERSON:
8    Q    Is it the HESS audit?
9    A    There you go.  HESS.
10   Q    Are you familiar with the HESS audit?
11        (Simultaneously speaking.)
12   A    -- safety and security.
13   Q    And those are done on an annual basis or
14   biannual basis?
15   A    I will say at most annual, if not longer.
16   Q    Okay.  And in those audits have you seen
17   recommendations to increase the number of security
18   officers just as you were requesting personally that
19   you testified to earlier?
20        MS. CABEZA:  Objection form.
21   A    I don't recall if it had numbers of
22   security.  Most -- a lot of the times the audits
23   would find a door unlocked, a camera not working,
24   things of that nature, and maybe you have time
25   period to correct it.

1    BY MR. GERSON:
2    Q    Who from -- who from RAINN -- since you
3    talked about it, who from RAINN -- or how often --
4    strike that.
5         What is your understanding of the risk
6    assessment that RAINN conducted for Carnival that
7    you told me -- that you just testified to?
8         MS. CABEZA:  Objection form.
9    A    What is my opinion of it?
10   BY MR. GERSON:
11   Q    No.
12   A    What is my what?
13   Q    You said that you believe that RAINN,
14   which is a nonprofit organization conducted some
15   sort of security assessment or risk assessment of
16   the security needs of Carnival cruise ships.  Do you
17   remember telling me that?
18   A    No.
19   Q    That's not accurate?
20   A    That is not accurate.
21   Q    Okay.  So then let me ask the question
22   again.
23        Did Carnival ever hire a third-party
24   company to provide a risk assessment to determine
25   the security needs and security vulnerabilities on

1    Carnival ships in, say, the seven years prior to
2    2019?
3    A    Just RAINN for sexual allegations.  That's
4    the only third-party that I recall ever hiring for a
5    specific offense.  That did not include an
6    assessment of them telling me you need ten more
7    security people.
8    Q    Okay.
9    A    There was --
10   Q    Did Carnival ever hire a company to come
11   in and say you only have 20 security officers on a
12   particular vessel, and in order to provide adequate
13   security on all of your decks during the evening
14   hours or morning hours -- did Carnival ever hire a
15   company to provide them with some analysis of what
16   their findings may or what their recommendations may
17   be?
18        MS. CABEZA:  Objection form.
19   A    Nothing that came across my desk.  Again,
20   it was internal audit from corporate.
21   BY MR. GERSON:
22   Q    So Carnival just -- so I guess ultimately
23   what I am trying to understand from you, Mr. Froio,
24   is, you know, how was Carnival evaluating the
25   effectiveness of its security measures that were in

1    place over, you know, in the five years prior to
2    2019 in order to determine or to evaluate the
3    security needs and security vulnerabilities with
4    respect to staffing on its ships?
5         MS. CABEZA:  Objection form.
6    A    Corporate internal audit in my office.
7    BY MR. GERSON:
8    Q    Well, you already told me that you had
9    made requests to increase the security officers?
10   A    I did.
11   Q    And how were you making that assessment?
12   What information were you relying on to recommend to
13   your direct reports, including Lars Ljoen, that more
14   security officers were needed?
15        MS. CABEZA:  Objection form.
16   A    Request from shipboard personnel,
17   observations from my staff, you conclude that we
18   would want more security.
19   BY MR. GERSON:
20   Q    Now are you familiar with what post orders
21   are?
22   A    Yes.
23   Q    What are post orders?
24   A    Assignments.
25   Q    And who developed -- who was responsible

Page 98

1  for developing the post orders and assignments for
2  security officers on Carnival ships?
3      A    Generally the ship itself or my director,
4  my administrative director, would send out an order
5  for whatever for whatever reason.
6      Q    So you, as the director of security --
7  Vice President of Security for Carnival relied on
8  the staff captain and the chief security officer to
9  make the decision or to determine what the post
10  orders were for security officers on Carnival ships?
11      A    That's correct.
12          MS. CABEZA:  Objection form.
13  BY MR. GERSON:
14      Q    And so if you have a security officer
15  assigned to Deck 5 and its post orders are to patrol
16  all of Deck 5 between the hours of -- or Deck 5, 7,
17  and 9 during his shift, those assignments would come
18  from the ship itself?
19          MS. CABEZA:  Objection form.
20      A    Yes.
21  BY MR. GERSON:
22      Q    Do any of your security officers on your
23  ships, the staff captain or the assistant chief
24  security officer, to your knowledge do they attend
25  any formal training in the United States by any

Page 99

1  security organization, such as As Is or any other
2  security company as part of their job requirements?
3          MS. CABEZA:  Objection form.
4      A    They are trained by the FBI, Homeland
5  Security, local police, D.E.A., Coast Guard, outside
6  counsel, legal department, loss prevention, air
7  team, all this training is given every two years.
8  We bring them in to Miami.
9  BY MR. GERSON:
10      Q    Why doesn't Carnival require its security
11  officers to obtain a security license in the state
12  of Florida?
13          MS. CABEZA:  Objection form.
14      A    Why would it be specific to Florida?
15  BY MR. GERSON:
16      Q    Well, anywhere?
17      A    Maritime law I am sure doesn't request it.
18      Q    So because maritime law doesn't require
19  security officers to maintain any security
20  credentials, training, or certifications, Carnival
21  just took the position that if it is not required we
22  are not going to do it?
23          MS. CABEZA:  Objection form.
24      A    They are required to attend and get
25  certifications under the maritime laws established

Page 100

1  by international maritime organization.  All that is
2  documented.  They have certificates to prove they
3  have been trained in certain things.  MARAD gives
4  them -- well, the --
5          (Simultaneously speaking.)
6  BY MR. GERSON:
7      Q    Do any of those organizations require or
8  make any reference to what a sufficient number of
9  security officers are in order to provide security
10  on a passenger vessel with, let's say, 4,000
11  passengers?
12          MS. CABEZA:  Objection form.
13      A    Not to my recollection.
14  BY MR. GERSON:
15      Q    So just based on whatever the budget is,
16  that is how the decision was made in terms of how
17  many security officers you can have on a ship?
18          MS. CABEZA:  Objection form.
19      A    You are simplifying it just to the budget?
20  BY MR. GERSON:
21      Q    Well, what other -- well, you are the one
22  who said the budget.  What other considerations --
23      A    The budget is key.  If you are maintaining
24  at a vessel with 20 security people and your
25  incidents are minimal compared to what goes on land

Page 101

1  based, you have adequate security.
2      Q    What is a minimal number of incidents?
3      A    It depends on what kind of incident it is.
4  One sexual assault bothers me.  One homicide bothers
5  me.  One arson bothers me.  One serious assault
6  would bother me.
7          In this case you all know, as well I know,
8  people are on vacation, they get in shoving matches,
9  things get stolen.  I mean, how do you come up with
10  a number?  I don't know.
11      Q    Well, how do you come up with a number?
12  You have already suggested some numbers.  And all I
13  am asking you is why didn't you ever suggest that
14  Carnival hire a third-party consulting agency, just
15  like you're operating right now and working on
16  behalf of Norwegian to evaluate the security needs
17  and security vulnerabilities on Carnival ships in
18  order to prevent rape and sexual assault prior to
19  2019?
20          MS. CABEZA:  Objection form.
21      A    Well, if you looked at the resumes of the
22  people who worked in my office, highly qualified
23  retired law enforcement people, all kinds of
24  credentials, you name it, they are as good as a
25  vendor like me now.

Page 102

1  BY MR. GERSON:
2      Q    Why is it that Carnival security officers
3  predominantly are from the Philippines?
4      A    Why?
5           MS. CABEZA:  Objection form.
6      A    (Continued )  It is a good area to recruit
7  from.  When we first took over shipboard security, a
8  lot of the officers were from Subic Bay.  They did a
9  good job.  And expanded to India.  We have tried
10 Americans, military, prior law enforcement.  The
11 Filipinos and the Indians just do a great job.  They
12 are very loyal and they work hard.
13 BY MR. GERSON:
14     Q    When you say they are very loyal, are you
15 suggesting that American security professionals,
16 such as a security officer licensed in the state of
17 Florida with training and a certification program
18 that is certified by the Florida Department of
19 Agriculture is just -- is inferior to the security
20 credentialing and security -- quality security
21 services that the Filipinos or the Philippines
22 provides?
23          MS. CABEZA:  Objection form.
24     A    I never said that had.
25

Page 103

1  BY MR. GERSON:
2      Q    Are you aware of the fact that in the
3  state of Florida that in order to run a third-party
4  security company that you need to actually have a
5  security license?
6           MS. CABEZA:  Objection form.
7      A    Under certain circumstances.
8  BY MR. GERSON:
9      Q    I am sorry?
10     A    Certain circumstances.
11     Q    And as part of the licensing requirements,
12 are you aware of the fact that not only in order to
13 obtain a security license, that you need to take a
14 class and examination in order to obtain a license
15 to act as a security guard in the state of Florida?
16          MS. CABEZA:  Objection form.
17     A    I am aware of that.
18 BY MR. GERSON:
19     Q    Has Carnival ever considered hiring a
20 third-party security company with licensed security
21 professionals to work on its ships?
22          MS. CABEZA:  Objection form.
23     A    I think they considered it at one time,
24 but they were just worried about their knowledge of
25 shipboard activity versus land-based activity.

Page 104

1  BY MR. GERSON:
2      Q    Tell me how shipboard activity in the
3  context of crime on cruise ships is different from
4  crime in a land-based environment?
5      A    In my opinion it's less on cruise ships
6  than it is land based.  That's my opinion.
7      Q    What are you basing that on?
8      A    Statistics.
9      Q    Have you ever conducted an analysis of the
10 number of times there has been a rape or a sexual
11 assault reported in a hotel in Miami, Florida, as
12 opposed to a comparable cruise line or cruise ship?
13     A    Actually CLIA did a study and brought in a
14 professional.  CLIA that represents the industry.
15 And they came up with statistics and it showed there
16 is less incidents shipside than there are shoreside.
17     Q    What information are you basing that on?
18     A    A study that CLIA did a few years back.
19     Q    And you are referencing CLIA which is
20 comprised of members in the cruise line industry,
21 correct?
22     A    Correct.  And --
23     Q    By --
24     A    Go on.
25     Q    By members we are talking about the cruise

Page 105

1  line operators, correct?
2           MS. CABEZA:  Objection form.
3      A    The operators?  What do you mean by the
4  operators?  I am talking about the security group
5  with CLIA.
6  BY MR. GERSON:
7      Q    Well, I think -- what I was asking you was
8  I asked you whether or not Carnival had ever
9  considered hiring a third-party security company to
10 provide security on cruise ships.  And you said that
11 we considered it, but we decided not to go that
12 route because of differences in crime on cruise
13 ships -- on land, such as rape and sexual assault,
14 as opposed to crime, rape, and sexual assault at
15 sea, correct?
16          MS. CABEZA:  Objection form.
17     A    That's what I said.
18 BY MR. GERSON:
19     Q    You do agree that, you know, on a cruise
20 ship, and we have already talked about this, that
21 you knew as the Vice President of Security that most
22 of the cruise ship rapes and sexual assaults occur
23 in the staterooms, correct?
24          MS. CABEZA:  Objection form.
25     A    I would say most of them, yes.

Page 106

1  BY MR. GERSON:
2      Q    Okay.  Most of them include passengers,
3  including adolescents, correct?
4          MS. CABEZA:  Objection form.
5      A    Most of them?
6  BY MR. GERSON:
7      Q    Some of them?
8      A    Some of them, yeah.
9      Q    A good majority of them, right?
10         MS. CABEZA:  Objection form.
11     A    Some of them.
12 BY MR. GERSON:
13     Q    And the types of allegations that you have
14 been aware of in the past, tell me about them?
15         MS. CABEZA:  Objection form.
16     A    You want me to discuss cases with you?
17 BY MR. GERSON:
18     Q    Well, you don't have to tell me the
19 specific case.  But have you ever been aware of a
20 passenger who claimed that she was walking down
21 her -- to her stateroom and she was forced into
22 another stateroom where she was attacked by
23 passengers?
24         MS. CABEZA:  Objection form.
25     A    There has been allegations of that, yes.

Page 107

1  BY MR. GERSON:
2      Q    Okay.  There has been lots of those
3  reports, haven't there been?
4          MS. CABEZA:  Objection form.
5      A    Being pulled into a cabin?  Lots of them?
6  I wouldn't use that word either.
7  BY MR. GERSON:
8      Q    Okay.  Well, there have been -- you don't
9  deny that there --
10     A    They have happened.
11     Q    They have happened?
12     A    It has happened, yes.
13     Q    And what are some of the other context --
14 or have there been other reports of passengers who
15 have reported they have been the victim of a rape or
16 a sexual assault because they were intoxicated and
17 accompanied by strangers down to the staterooms
18 where they were subsequently attacked?
19         MS. CABEZA:  Objection form.
20     A    Yes.
21 BY MR. GERSON:
22     Q    And that's -- those -- you have read those
23 reports during the time that you were the Vice
24 President of Security, correct?
25     A    Correct.

Page 108

1          MS. CABEZA:  Objection form.
2  BY MR. GERSON:
3      Q    And you have also investigated those
4  instances prior to being the Vice President of
5  Security, correct?
6          MS. CABEZA:  Objection form.
7      A    Correct.
8  BY MR. GERSON:
9      Q    And those same -- those same allegations
10 and reports that you were aware of, both when you
11 were a member of -- when you are the Vice President
12 of Security and as just the director, some of those
13 incidents also included late reporting, correct?
14         MS. CABEZA:  Objection form.
15     A    Some have been, yes.
16 BY MR. GERSON:
17     Q    Now why doesn't Carnival have more
18 stringent requirements for security officers with
19 respect to the qualifications and experience before
20 working on a cruise ship?
21         MS. CABEZA:  Objection form.
22     A    More?  They met the minimal requirements
23 and they had the training to fulfill their duties.
24 BY MR. GERSON:
25     Q    Well, you said the minimum requirements --

Page 109

1  you said there were no minimum requirements?
2      A    I didn't say that.  I said they had three
3  years of training and --
4      Q    Three years, right.
5          But the three years --
6      A    They had to go to Magsaysay.  They had to
7  go through on-the-job training.  They had to shadow
8  a senior officer.  And then they would be cut free
9  if they passed all of those stages.
10     Q    Well, why is there --
11     A    During that time there is a lot of
12 training, a lot of knowledge of the ships, and how
13 to handle ship security.
14     Q    Where does the training come from?
15     A    Which training?
16     Q    As the training you are referring to.  You
17 said there is a lot of training.  So talk to me
18 about the training for --
19     A    Magsaysay.
20     Q    So talk to me about the training for
21 patrolling hot spots?
22         MS. CABEZA:  Objection form.
23     A    Develop --
24         (Simultaneously speaking.)
25

Page 110

BY MR. GERSON:

2  Q   -- hot spot, correct?

3  A   Developed out of my office --

4  Q   But --

5  A   -- patrol, talk to them, outlined at this

6  time, practical experience with a senior officer

7  showing how to patrol on a vessel.

8  Q   And where did the information of how to

9  adequately patrol a vessel come from?

10  A   My office.

11  Q   And when you say your office, where did

12  you get the information?

13  A   I had, I don't know, ten or 12

14  investigators, all retired law enforcement, all

15  certified police officers, all certified in patrol

16  tactics, practical experience and patrol tactics,

17  investigation, deescalation.

18  Q   You already told me, Mr. Froio, that

19  you -- it is your belief that crime at sea is

20  different than crime on land, right?

21  A   I didn't say that.

22      MS. CABEZA:  Objection form.

23  A   (Continued)  To a certain extent.

24  BY MR. GERSON:

25  Q   Okay.  To what extent?

Page 111

1  A   The ability to translate patrol tactics

2  from a shoreside perspective in a patrol car to a

3  foot-roving patrol on a ship is different.  And

4  until you have the feel of the vessel, understand

5  the vessel, understand the hot spots, the entrance,

6  the exits, where things happen, it is different.

7  Q   What is a hot spot?

8  A   The disco, the pool --

9  Q   What is your definition of a hot spot?

10  A   A lot of activity.

11  Q   Is a hot spot also an area where crime is

12  more likely to occur?

13  A   Depends on what you are talking about.

14      MS. CABEZA:  Objection form.

15  BY MR. GERSON:

16  Q   Well, in the context of rape or sexual

17  assault, staterooms would be considered a hot spot,

18  wouldn't it?

19      MS. CABEZA:  Objection form.

20  A   How are you going to patrol a stateroom?

21  BY MR. GERSON:

22  Q   Well, you wouldn't --

23      (Simultaneously speaking.)

24  A   It's behind closed doors, Counselor.

25  Q   -- a stateroom --

Page 112

1  A   It's behind closed doors, Counselor.

2  Q   You could have patrols that -- increase

3  patrol or increase patrols during certain hours,

4  such as the early morning hours, in the corridor

5  areas, right?

6      MS. CABEZA:  Objection form.

7  A   Based on the vessel, based on the

8  itinerary, based on the activity, based on the

9  ship's security officer, assess the post orders,

10  that is where scheduling comes in.

11  BY MR. GERSON:

12  Q   Now not only are there reports of alleged

13  rapes and sexual assaults on the cruise ships, isn't

14  it true that Carnival maintains information that

15  memorializes complaints by passengers about various

16  issues, including the quality of security?

17      MS. CABEZA:  Objection form.

18  A   Yes.

19  BY MR. GERSON:

20  Q   Do you ever review that information or did

21  you ever review that information?

22      MS. CABEZA:  Objection form.

23  A   Over the years, of course.

24  BY MR. GERSON:

25  Q   Well, was there any policy in place for

Page 113

1  the frequency in which you would review passenger

2  complaints about the nature of quality of security

3  services that were being provided on Carnival cruise

4  ships?

5      MS. CABEZA:  Objection form.

6  A   I would have to generalize that to say

7  anything that I really reviewed from a guest

8  complaint could have been the way security

9  approached them or his voice was too loud, or if

10  there was a fight they used too much force.

11      Again, I would be guessing to say that I

12  read complaints that said you need more security.

13  Is it possible?  Of course, it is possible the time

14  I spent there.

15  BY MR. GERSON:

16  Q   Were you aware that there had been

17  hundreds and hundreds of complaints in the five

18  years prior to -- or three years prior to 2019 about

19  the quality of security services that Carnival was

20  providing by its passengers?

21      MS. CABEZA:  Objection form.

22  A   Hundreds of complaints?

23  BY MR. GERSON:

24  Q   Yes.

25  A   I am unaware of that.

1      Q      Now when we started out the deposition,
2   you had told me that you had some basic
3   understanding or familiarity or basic recollection
4   of the incident involving J.F., correct?
5              MS. CABEZA:  Objection form.
6      A      My recollection is that it happened on the
7   Horizon.
8   BY MR. GERSON:
9      Q      What was your --
10     A      How it happened, I haven't -- again, if
11  you serve me with the proper documents, maybe I
12  would recall more.  But I don't -- I can't tell you
13  the specifics of that incident.
14     Q      Okay.  Are you familiar with something
15  called the LockLink records?
16     A      The what?
17     Q      LockLinks?
18     A      It doesn't ring a bell.
19     Q      The documentation --
20     A      Oh, LockLink.
21     Q      Yes.
22     A      Yes.  Sorry.
23     Q      What are LockLink records?
24     A      It shows access to a cabin or to any door
25  that is compatible on the system.

1      Q      And are you aware of what the procedure is
2   with respect to preservation of the LockLink records
3   on Carnival ships prior to you retiring?
4              MS. CABEZA:  Objection form.
5      A      The amount of time to hold onto the
6   LockLink?
7   BY MR. GERSON:
8      Q      Yes.
9      A      I cannot remember.
10     Q      To the best of your recollection what was
11  it?
12             MS. CABEZA:  Objection form.
13     A      I would be guessing.  I don't want to give
14  you a number.
15  BY MR. GERSON:
16     Q      Well, I don't want you to guess, but what
17  is the best number you could give me based on what
18  you know?
19             MS. CABEZA:  Objection form.
20     A      How long you keep a LockLink?
21  BY MR. GERSON:
22     Q      Yeah.
23     A      I don't remember.
24     Q      If you were provided the six more security
25  officers that you made reference to earlier on the,

1   say, Carnival Horizon, where would you deploy them?
2              MS. CABEZA:  Objection form.
3      A      I would have to look at the layout of the
4   ship again.  If there was a lot of fights in the
5   disco, a lot of fights at a pool bar, if there was
6   stowaway issues on an outer island, it just all
7   depends.
8   BY MR. GERSON:
9      Q      Well --
10     A      I would rely, again, on the staff captain
11  and the chief security officer.
12     Q      Okay.  Well, knowing, as you told me, most
13  of the rapes and sexual assaults that are reported
14  on the cruise ships occur in the passenger
15  corridors, would you -- if you had been -- if the
16  budget permitted it and you were provided more
17  security officers, say half a dozen as you made
18  reference earlier, would you have suggested that
19  those security officers be assigned to the passenger
20  corridor areas?
21             MS. CABEZA:  Objection form.
22     A      I would look at the numbers of incidents
23  that happened regarding a sexual assault in a cabin,
24  in a corridor, and so on and so forth.  If there was
25  one, probably not.

1      Q      Well --
2      A      If there were ten, absolutely.
3      Q      Well, from a global --
4      A      Hypothetical numbers I am throwing out.
5      Q      Well, from a global -- a fleet
6   perspective, we already know and you have already
7   testified, that most of the rapes and sexual
8   assaults on Carnival ships happen in the passenger
9   staterooms in a number of circumstances?
10             MS. CABEZA:  Objection form.
11  BY MR. GERSON:
12     Q      Right?
13     A      Correct.
14     Q      So with that knowledge that that is where
15  most of the rapes and sexual assaults occur, would
16  you -- and you were provided more security officers
17  to staff Carnival ships, would you at least
18  recommended that some of those resources be used in
19  those areas?
20     A      Depends on the vessel.
21     Q      What would it depend on?
22     A      Amount of incidents in a cabin of sexual
23  assault.
24     Q      Well, you agree that it's very difficult
25  to predict when a rape or sexual assault is going to

Page 118

1  happen, correct?
2         MS. CABEZA:  Objection form.
3     A   I am glad you are saying that, Counselor.
4  That is correct.
5  BY MR. GERSON:
6     Q   Which is all the reason why security
7  deterrence and a security presence is needed in
8  order to address the unknown about when a security
9  incident may occur?
10        MS. CABEZA:  Objection form.
11    A   Again, Counselor, you could have five
12 policemen patrolling a block in Miami, you go around
13 the corner, something could happen behind you.  I
14 mean, it is --
15 BY MR. GERSON:
16    Q   Well, you are --
17    A   -- hit or miss.  It's hit or miss.  Visual
18 is nice.  Sometimes undercover security is nice.
19    Q   Okay.  But when you say visual is nice,
20 you mean security presence is a good thing --
21    A   Yes.
22    Q   -- in terms of deterring crime, correct?
23        MS. CABEZA:  Objection form.
24    A   Yes, sir.
25

Page 119

1  BY MR. GERSON:
2     Q   Okay.  When you are a police officer
3  working for the New York State Police, you had a
4  uniform, a cop car, right?
5         MS. CABEZA:  Objection form.
6     A   Not always.
7  BY MR. GERSON:
8     Q   Your presence was known, right?
9     A   When I was --
10        MS. CABEZA:  Objection form.
11    A   (Continued) -- in uniform, yes.
12 BY MR. GERSON:
13    Q   And you were in uniform.
14        And your security officers that are
15 working on a cruise ship, if there are only nine
16 security officers per shift that are required to
17 patrol 15 decks, you theoretically have a security
18 officer patrolling the engine room with the same
19 frequency that they are patrolling a passenger
20 stateroom over a number of hours --
21        MS. CABEZA:  Objection form.
22 BY MR. GERSON:
23    Q   -- isn't that correct?
24    A   Okay.
25    Q   So having more security officers would be

Page 120

1  a deterrent fleet wide on all Carnival ships no
2  matter whether or not there was ten rapes and sexual
3  assaults on a particular vessel over a number of
4  years or just a certain number of rapes and sexual
5  assaults across the fleet?
6         MS. CABEZA:  Objection form.
7     A   Again, Counselor, a uniform presence is
8  nice.
9  BY MR. GERSON:
10    Q   Why does --
11    A   There is no question about it.
12    Q   Okay.
13    A   But here you turn the corner, something
14 could happen.  If you have roving patrols, eyes and
15 ears, see something say something, you have quite a
16 few basis covered right there.  Around the clock
17 there are crew members up in housekeeping or
18 whatever.
19 BY MR. GERSON:
20    Q   Having nine security officers to patrol a
21 passenger vessel with 15 decks and 4,000 passengers
22 isn't enough, is it --
23        MS. CABEZA:  Objection form.
24 BY MR. GERSON:
25    Q   -- to a shift?

Page 121

1     A   It is adequate.
2     Q   Based on what?
3     A   The number of incidents on the vessel.
4     Q   If it was adequate, why are you requesting
5  more?
6         MS. CABEZA:  Objection form.
7     A   I told you earlier, you are talking to a
8  security guy.  The more is always better.  You will
9  never say you have enough, you always ask for more.
10 BY MR. GERSON:
11    Q   Could Carnival have had less than nine
12 security officers or -- strike that.
13        Based on the security deployment schedule
14 if there were ten security officers working a
15 particular shift on a Carnival ship and three of
16 them are assigned to the nightclub, doesn't that
17 create a security vulnerability with respect to
18 other areas of the ship during that timeframe.
19        MS. CABEZA:  Objection form.
20    A   Everything is hypothetical what you are
21 saying, Counselor.
22 BY MR. GERSON:
23    Q   Well, I want you to take my hypothetical
24 into account in the sense that --
25    A   I am not going to -- I am not going to

Page 122

1   affirm a hypothetical.
2       Q    Okay.  Well, I would like you to assume
3   for purposes of my question that the testimony in
4   this case is that there was a certain number of
5   security officers that were assigned to the
6   nightclub on the Carnival Horizon on the evening and
7   morning hours in which my client, J.F., alleges she
8   was raped and sexual assault in her stateroom.
9   Okay?
10          There is also testimony in the record that
11  that number is in the neighborhood of approximately
12  three security officers that were assigned to the
13  nightclub during those hours.  Okay?
14          You had --
15      A    What time was the incident?
16      Q    In the early morning hours?
17      A    Early morning hours?
18      Q    Yeah, I don't have an exact time.  But my
19  point is that if you have three security officers
20  working in the nightclub and you only have a total
21  of nine or ten, then you have another fourteen decks
22  that need to be manned by what is left.
23          MS. CABEZA:  Objection form.
24  BY MR. GERSON:
25      Q    How is that enough?

Page 123

1           MS. CABEZA:  Objection form.
2       A    How many sexual assaults were on the
3   Horizon that week?  One?  One allegation?
4   BY MR. GERSON:
5       Q    Does that make it okay?
6       A    It doesn't make it okay.  But was there
7   just one?  Then I can tell you that it is working.
8       Q    If it was working, why was the Cruise Ship
9   Safety and Security Act of 2010 enacted, which you
10  already testified that you were present for and
11  aware of and actually met with members of Congress
12  about?
13          MS. CABEZA:  Objection form.
14      A    You, as well as I, know that there are
15  cruise lines out there that aren't trained, didn't
16  report, and so on and so forth.
17  BY MR. GERSON:
18      Q    And Carnival was one of them?
19      A    Carnival is not one of them.  I can tell
20  you that right now.  I am telling you right now --
21  people want to clean my office.
22          I can tell you right now Carnival has
23  always been proactive, has always done the right
24  thing, no coverups under this guy's watch ever.
25      Q    And I am not suggesting that you have.

Page 124

1       A    Well, I am taking it that you are.
2       Q    No, I am not.
3       A    You just threw Carnival at me when I said
4   between us we know there are lines out there that
5   did not report.
6       Q    Well --
7       A    And the reason why the answer to your
8   question -- let me --
9       Q    I am sorry.  I am not trying to interrupt
10  you, sir?
11      A    All right.
12      Q    My point to you, so you understand where I
13  am coming from, is that CVSSA was enacted as a
14  response to a concern in the United States about the
15  number of rapes and sexual assaults and other
16  violent crimes that were occurring in the cruise
17  line industry, which included Carnival.
18          MS. CABEZA:  Objection form.
19      A    That I am aware of, yes.
20  BY MR. GERSON:
21      Q    Okay.
22      A    I understand why CVSSA was implemented.  I
23  understand it.
24      Q    And even with that knowledge, no changes
25  to increase the quality of security personnel or the

Page 125

1   number of security personnel were implemented by
2   Carnival as a measure to try and reduce, prevent, or
3   deter rape and sexual assault with respect to the
4   number of security officers Carnival was employing
5   on its ships during the five years prior to 2019?
6           MS. CABEZA:  Objection form.
7       A    That is not factual, Counselor.
8   BY MR. GERSON:
9       Q    Let me just ask you a quick couple of
10  follow-up questions, if you don't mind, and I should
11  be done.
12          Mr. Froio, you have given me your address
13  when we started, correct?
14      A    Yes.  While we are on the topic, please
15  serve me by telephone.  I am not the kind of guy
16  that is going to evade you.
17      Q    Okay.
18      A    Sometimes in the evening -- my wife just
19  got out of the hospital.
20      Q    I am sorry.
21      A    She even accepted the subpoena.
22      Q    I didn't know that.  I apologize.  Nothing
23  personal about that.  Just following the procedures.
24      A    You got my name, you got my phone number.
25  If you ever need me again.

Page 126

1    Q    Okay.
2    A    Okay.
3    Q    I appreciate that.  And, you know, I am
4  just following the procedures in order to make sure
5  that you appear, otherwise theoretically you have no
6  obligation in the absence of a subpoena.  And no
7  intention was -- there was no intention to startle
8  your wife or any of your family members.
9         I just have a couple of follow-up
10 questions for you, Mr. Froio.
11        We have already established that you are
12 not a member of As Is, correct?
13   A    That's correct?
14   Q    You hold no official license or training
15 or certification -- or you hold no security officer
16 license in the state of Florida, correct?
17   A    Correct.
18   Q    You don't hold any security manager's
19 license in the state of Florida, correct?
20   A    Correct.
21   Q    Your security officers on your cruise
22 ships don't hold any security licenses issued by any
23 sort of agency in the United States, correct?
24   A    That's not correct.
25   Q    Okay.  How am I not correct?

Page 127

1    A    MARAD, maritime administration Federal
2  Government certified our training for shipboard
3  security.  Upon the completion of the two-week
4  training, which abides by all the criteria
5  recommended by MARAD, they give a certification on.
6  That certification goes from the staff captain to
7  the chief security who does on board training, train
8  the trainers.  So security officers should have had
9  a MARAD certification from the United States.
10   Q    What is your educational background?
11   A    I have got a master's -- mid career
12 master's degree from Syracuse University in public
13 administration, a bachelor degree in sociology, AS
14 degree in criminology, New York State Police
15 Academy, the Florida Academy.
16        MR. GERSON:  I don't have
17   anything further for you at this time.  I
18   appreciate you making yourself available,
19   and I have nothing further for you.
20        I don't know if anyone else has
21   any questions.
22        MS. CABEZA:  Mr. Froio, I have
23   about, I would say, 30 minutes of
24   questioning.  Would you prefer to take a
25   short 15-minute break.  I know -- I am

Page 128

1  sure you haven't eaten any lunch or
2  anything.  Or do you prefer to continue on
3  right now?
4         THE WITNESS:  Yeah, we can
5  continue.  Did you say 30 minutes?
6         MS. CABEZA:  Yeah, I am not sure
7  if Mr. Gerson might have a few follow up
8  after that, but I have approximately 30
9  minutes of questions I would say, maybe
10 less.
11        THE WITNESS:  We will continue.
12        MR. GERSON:  Can we just take a
13 two-minute break?  Is that okay?
14        MS. CABEZA:  That is fine.
15        THE VIDEOGRAPHER:  Off the
16 record 12:50 p.m.
17        (Whereupon, a short recess was
18 taken.)
19        THE VIDEOGRAPHER:  On the record
20 12:58 p.m.
21             CROSS EXAMINATION
22 BY MS. CABEZA:
23   Q    Mr. Gerson kept asking you about the six
24 more security officers, correct?
25   A    Yes, ma'am.

Page 129

1    Q    You never testified that Carnival needed
2  six security officers on the Horizon, correct?
3         MR. GERSON:  Form.
4    A    Needed?  No, I did not.
5  BY MS. CABEZA:
6    Q    RAINN never told Carnival that it needed
7  six more security officers on the Horizon, correct?
8         MR. GERSON:  Form.
9    A    Correct.
10 BY MS. CABEZA:
11   Q    Carnival ships were RAINN certified at the
12 time of the incident?
13   A    Yes.
14   Q    Mr. Gerson asked you about all alleged
15 rapes and sexual assaults that may have occurred on
16 ships in the past ten years.  Do you remember that?
17   A    Yes.
18   Q    But you don't remember the number of
19 alleged rapes or sexual assaults, correct?
20        MR. GERSON:  Form.
21   A    No, I do not.
22 BY MS. CABEZA:
23   Q    Just because an assault is reported
24 doesn't mean it occurred?
25        MR. GERSON:  Form.

1  BY MS. CABEZA:
2      Q    Correct?
3      A    Correct.
4      Q    Let me ask you a little bit about your
5  experience as a police officer in comparing that to
6  when you are involved with security on a ship.
7  Policing in a city is done with police officers
8  being posted in some areas where incidents are known
9  to occur and then police generally patrol or respond
10 to other areas?
11          MR. GERSON:  Form.
12     A    Correct.
13 BY MS. CABEZA:
14     Q    Police aren't stationed outside of
15 anyone's home, correct?
16     A    Correct.
17     Q    Ships are similar, correct?
18     A    Repeat that, please.
19     Q    That cruise ships are similar, correct?
20          MR. GERSON:  Form.
21     A    In an aspect, yes.
22 BY MS. CABEZA:
23     Q    You have security officers stationed at
24 areas where you might expect there to be more
25 incidents, like the nightclub?

1      A    Correct.
2      Q    Then you would have security officers
3  patrolling other areas?
4      A    Correct.
5      Q    So take the City of Buffalo where you
6  worked for 20 years, comparing that to a ship, there
7  are more security officers per passenger on a ship
8  than there were police officers per citizen of the
9  City of Buffalo, correct?
10          MR. GERSON:  Form.
11     A    I can only rely on what you are saying.  I
12 would think so.
13 BY MS. CABEZA:
14     Q    You were asked about the stationing
15 security officers in corridors.  Do you remember
16 that?
17          MR. GERSON:  Form.
18     A    Yes.
19 BY MS. CABEZA:
20     Q    You were also asked about where sexual
21 assaults were known to sometimes occur?
22          MR. GERSON:  Form.
23     A    Yes.
24 BY MS. CABEZA:
25     Q    You mentioned that they occur sometimes in

1  staterooms?
2      A    Correct.
3      Q    However sexual assaults don't occur in the
4  passenger corridors, correct?
5          MR. GERSON:  Form.
6      A    Did I say that it never happened in a
7  corridor?  I am not sure.
8  BY MS. CABEZA:
9      Q    Well, so if anything, the assaults
10 occurred inside the cabins themselves where the
11 security is not allowed to be stationed?
12     A    That's correct.
13     Q    Security, in fact, cannot monitor the
14 interior of passenger cabins, correct?
15     A    Correct.
16     Q    In your 27 years of experience in Carnival
17 security, would you agree that Carnival did a good
18 job?
19          MR. GERSON:  Form.
20     A    Yes, I agree with that.
21 BY MS. CABEZA:
22     Q    Implemented additional measures to enhance
23 security?
24     A    Yes.
25     Q    Carnival security met the legal standard

1  in place at the time?
2          MR. GERSON:  Form.
3      A    Correct.
4  BY MS. CABEZA:
5      Q    Then once the Cruise Vessel Safety
6  Security Act was made law, Carnival also complied
7  with the law security measures and requirements,
8  correct?
9          MR. GERSON:  Form.
10     A    Yes, ma'am.
11 BY MS. CABEZA:
12     Q    There are incidents, like assaults in
13 passenger cabins behind closed doors, that no number
14 of security officers could prevent, correct?
15     A    In my opinion it's very difficult to
16 prevent something like that.
17     Q    There were -- sorry, strike that.
18          You were asked about staffing security
19 officers during your 27 years at Carnival --
20          MR. GERSON:  Form.
21 BY MS. CABEZA:
22     Q    -- correct?
23     A    Yes.
24     Q    There was a time that you asked for more
25 security officers to staff ships, correct?

Page 134

1    A    Yes.
2    Q    The number of the security officers you
3  asked for on each ship depended on the type of ship
4  and its itinerary, correct?
5    A    Correct.
6    Q    There are, in fact, many things
7  considered, such as the hot spots, the size of the
8  vessel, the amount of passengers, correct?
9          MR. GERSON:  Form.
10   A    Correct.
11  BY MS. CABEZA:
12   Q    You also mentioned a budget earlier, but
13  that was only one of the many considerations when
14  staffing security officers on the ships, correct?
15         MR. GERSON:  Form.
16   A    Correct.
17  BY MS. CABEZA:
18   Q    Would you agree with me that you would
19  always in a perfect world like to have more security
20  officers?
21   A    I agree.
22   Q    Just like in a perfect world, you would
23  like to have more police officers in a city?
24   A    Correct.
25   Q    Do you believe the number of security

Page 135

1  officers on board the Horizon was reasonable --
2          MR. GERSON:  Form.
3  BY MS. CABEZA:
4    Q    -- correct?
5    A    Correct.
6          MS. CABEZA:  No further
7  questions.
8          MR. GERSON:  I have nothing
9  further.
10         Mr. Froio, you have the
11  opportunity to read or waive.  You just
12  have to state on the record what you want
13  to do.  Most people waive.  But I don't
14  want to tell you or influence you one way
15  or another, but most people waive.
16         THE WITNESS:  What was that read
17  or what?
18         MR. GERSON:  Read or waive.
19         MS. CABEZA:  Read the deposition
20  to ensure your testimony was accurately
21  recorded and taken.  You can check if
22  there are typos or mistakes, someone
23  didn't understand.  You are able to ensure
24  your testimony was recorded accurately.
25  Or you can waive that right to do so.

Page 136

1          THE WITNESS:  I waive.  I defer
2  to you, Lauren and Charlotte.
3          THE VIDEOGRAPHER:  Okay.  Off
4  the record 1:05 p.m.
5          (Whereupon, the video portion of
6  the deposition was concluded.)
7          MR. GERSON:  We will take an
8  Etran.
9          THE COURT REPORTER:  All right.
10  Just regular turnaround?
11         MR. GERSON:  Yeah, and then we
12  have one exhibit, I believe.  That was the
13  deck plan.  We will mark it if it wasn't
14  identified, that's Exhibit 1 to the depo.
15  Okay?
16         THE COURT REPORTER:  All right.
17         Lauren, do you need a copy?
18         MS. CABEZA:  Yes, please.
19         THE COURT REPORTER:  All right.
20         Have a great day all of you.
21         THE WITNESS:  Have a good day
22  everybody.
23         THE COURT REPORTER:  You, too.
24         MS. CABEZA:  Thank you,
25  Dominick.

Page 137

1          (Whereupon, Plaintiff's Exhibit No. 1 was
2  marked for identification.)
3
4          (The reading and signing of the
5      deposition was requested.
6
7          (The deposition was concluded at
8      1:10 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 138

```
 1              CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA )
                      )
 4   COUNTY OF BREVARD)
 5
 6
 7       I, DEBORAH L. WATERS, CLP, FPR, Notary Public
 8     State of Florida, the undersigned authority, do
 9            hereby certify that the witness
10                  Dominick Froio, Jr.
11       (Florida driver's license *** 9229-0)
12            personally appeared before me and
13                   was duly sworn.
14         WITNESS MY HAND AND OFFICIAL SEAL,
15           this 28th day February of 2023,
16                  at Viera, Florida
17
18
19
                _____
20
            DEBORAH L. WATERS, CLP, FPR
21            Certified Legal Professional
          Certified Florida Professional Reporter
22          Board Certified Civil Trial Law SS
          Notary Public, State of Florida at Large.
23
24
     Notary Commission #GG 960326
25   Expires February 19, 2024
```

## Page 139

```
 1   C E R T I F I C A T E   O F   R E P O R T E R
 2   STATE OF FLORIDA )
                      )
 3   COUNTY OF BREVARD)
 4
        I, Deborah L. Waters, Certified Legal
 5   Professional, Certified Florida Professional
     Reporter, do hereby certify that I was authorized to
 6   and did stenographically report the deposition of
     Dominick Froio, Jr.; that a review of the transcript
 7   was requested; and that the foregoing transcript,
     Pages 1 through 137, is a true record of my
 8   stenographic notes.
        I, FURTHER CERTIFY, that I am not a relative,
 9   employee or attorney, or counsel of any of the
     parties, nor am I a relative or employee of any of
10   the parties' attorney or counsel connected with the
     action, nor am I financially interested in the
11   action.
12
        WITNESS MY HAND AND OFFICIAL SEAL this
13   10th day of March 2023, at Viera, Brevard County,
     Florida.
14
15
16
17
18
19
20   _____
        Deborah L. Waters, CLP, FPR
21       Certified Legal Professional
      Certified Florida Professional Reporter
22      Board Certified Civil Trial Law SS
      Notary Public, State of Florida at Large
23
24
25
```

## Page 140

```
 1                    ERRATA
 2     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 3   IN RE: J.F. v Carnival Corporation; Dominick Froio,
                   Jr.; 02.28.2023
 4   PAGE & LINE
     NUMBER           CORRECTION AND REASON THEREFORE
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   Under penalties of perjury, I declare that I have
22   read the foregoing document and that the facts
23   stated in it are true.
24   DATED: _____  SIGNED: _____
25                               Dominick Froio, Jr.
```

## Page 141

```
 1                    ERRATA
 2     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 3   IN RE: J.F. v Carnival Corporation; Dominick Froio,
                   Jr.; 02.28.2023
 4   PAGE & LINE
     NUMBER           CORRECTION AND REASON THEREFORE
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   Under penalties of perjury, I declare that I have
22   read the foregoing document and that the facts
23   stated in it are true.
24   DATED: _____  SIGNED: _____
25                               Dominick Froio, Jr.
```

















































































